Patricia A. BROOKS, Plaintiff–
Appellant,

v.

CITY OF SAN MATEO, a municipal
corporation; San Mateo Police De-
partment; John Stangl, Chief of Po-
lice; Steven Selvaggio, Defendants–
Appellees.

No. 98–15818.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted May 14, 1999.

Filed Oct. 23, 2000.

920

court requested a vote on whether to rehear the matter en banc, but the matter failed to receive a majority of the votes of the nonrecused active judges in favor of en banc consideration. Fed. R.App. P. 35. The petition for rehearing en banc is denied.

## OPINION

KOZINSKI, Circuit Judge:

We consider the legal implications of a single, rather unsavory, episode of workplace sexual harassment.

John F. Prentice and Sheila A. Reid, Prentice & Scott, San Francisco, California, argued the cause for the plaintiff-appellant.

Nancy E. Pritikin, Littler, Mendelson, San Francisco, California, argued the cause for defendants-appellees, City of San Mateo, et al. With her on the briefs were Ronald J. Holland and Susan A.P. Woodhouse.

Alison Berry–Wilkinson, Rains, Lucia & Wilkinson, LLP, Pleasant Hill, California, argued the cause for defendant-appellee Steven Selvaggio. With her on the briefs was Kamili A. Williams.

Before: WOOD, Jr.,* KOZINSKI and RYMER, Circuit Judges.

## ORDER

The opinion filed June 5, 2000, and reported at 214 F.3d 1082, is withdrawn and superseded by the attached opinion. The petition for rehearing is otherwise denied. The full court was advised of the petition for rehearing en banc. A judge of the

## I

Our story begins when Patricia Brooks, a telephone dispatcher for the City of San Mateo, California, and her coworker, senior dispatcher Steven Selvaggio, manned the city's Communications Center, taking 911 calls on the evening shift. At some point during the evening, Selvaggio approached Brooks as she was taking a call. He placed his hand on her stomach and commented on its softness and sexiness. Brooks told Selvaggio to stop touching her and then forcefully pushed him away. Perhaps taking this as encouragement, Selvaggio later positioned himself behind Brooks's chair, boxing her in against the communications console as she was taking another 911 call. He forced his hand underneath her sweater and bra to fondle her bare breast. After terminating the call, Brooks removed Selvaggio's hand again and told him that he had "crossed the line." To this, Selvaggio responded "you don't have to worry about cheating [on your husband], I'll do everything." Selvaggio then approached Brooks as if he would fondle her breasts again. Fortunately, another dispatcher arrived at this time, and Selvaggio ceased his behavior. Soon thereafter Selvaggio took a break and left the building. Brooks immediately reported the incident and, the following

* The Honorable Harlington Wood, Jr., Senior Circuit Judge for the Seventh Circuit Court of Appeals, sitting by designation.

day, the city placed Selvaggio on administrative leave pending an investigation.

This, it turned out, was not the first time Selvaggio had made improper advances to co-workers. At least two other female employees, including Pat P., another senior dispatcher, had been subjected to similar treatment from Selvaggio. However, Selvaggio's earlier victims had not reported his misconduct. Only after the city launched its investigation into Brooks's allegations did these other incidents come to light.

While Selvaggio denied any misconduct, the investigation adopted Brooks's version of events and concluded that Selvaggio had violated the city's sexual harassment policy. Selvaggio resigned after the city initiated termination proceedings against him. He later pled no contest to misdemeanor sexual assault charges and spent 120 days in jail.

Despite the city's prompt remedial action, Brooks had trouble recovering from the incident. She took a leave of absence immediately afterward and began seeing a psychologist. She returned to work six months later. According to Brooks, her work environment had changed dramatically: The male employees ostracized her and her supervisors mistreated her. Brooks alleges that she had trouble getting her desired work shift and preferred vacation dates, while other employees with less seniority got their preferences. She also alleges that the city delayed approval of her sick leave benefits, reprimanded her

for conduct it overlooked in other employees [1] and gave her an unwarranted negative performance evaluation. Brooks signed the evaluation but indicated that she would appeal it. She submitted a written appeal which expressed her view that the evaluation was intended to retaliate against her for complaining about Selvaggio's behavior. While the city was considering her appeal, Brooks left work and never returned.

■ Brooks obtained right to sue notices from the EEOC and the California Department of Fair Employment and Housing. She then sued the city, the Police Department and its chief, John Stangl, for sexual harassment and retaliatory discrimination in violation of Title VII of the Civil Rights Act, see 42 U.S.C. § 2000e et. seq., and the California Fair Employment and Housing Act (FEHA), see Cal. Gov. Code § 12940 et seq.[2] All defendants moved for summary judgment.

The district court held that Selvaggio's assault of Brooks in the Communications Center was not severe enough to give rise to a hostile work environment claim. As for Brooks's retaliation claims, the district court held that she failed to show that she had suffered any adverse employment consequences. Based on these rulings, the district court granted the summary judgment motion.

On appeal, Brooks complains that the district court erred in ruling that the sexual assault was not sufficient to create a hostile work environment. She also ar-

---

1. Brooks has not renewed her argument that the reprimand was retaliatory. See Smith v. Marsh, 194 F.3d 1045, 1052 (9th Cir.1999) ("[O]n appeal, arguments not raised by a party in its opening brief are deemed waived.") (citing Brookfield Communications, Inc. v. West Coast Entertainment Corp., 174 F.3d 1036, 1046 n. 7 (9th Cir.1999)).

2. Brooks also named Selvaggio as a defendant in her FEHA complaint. Unlike Title VII, FEHA grants victims a cause of action for discrimination practiced by "any other person" in addition to that practiced solely by employers. Compare 42 U.S.C. § 2000e–2(a)

with Cal. Govt.Code § 12940(h). Nonetheless, the California Supreme Court has recently held that FEHA, like Title VII, does not support a claim of harassment against a fellow employee. See Carrisales v. Department of Corrections, 21 Cal.4th 1132, 1140, 90 Cal. Rptr.2d 804, 988 P.2d 1083 (1999) ("Consistent with the FEHA's primary concern with unlawful employment practices, it does not also impose personal liability for harassment on nonsupervisory coworkers."). Thus, Selvaggio cannot be held liable unless senior dispatchers are supervisors. We conclude they are not. See note 6 infra.

gues that the city is liable under FEHA and Title VII for failing to take steps to prevent Selvaggio's misconduct of which it had actual or constructive notice. Finally, Brooks claims that the district court erred in finding no adverse job action to support her retaliation claim. While Brooks argues that she was subjected to sexual discrimination under Title VII as well as FEHA, we need only assess her claim under federal law because Title VII and FEHA operate under the same guiding principles.[3]

## II

■ Title VII prohibits employment discrimination based on any of its enumerated grounds: " 'race, color, religion, sex, or national origin.' " *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (quoting 42 U.S.C. § 2000e–2(a)(1)). Sexual harassment is a species of gender discrimination: Harassing an employee on account of sex is, conceptually, the same as refusing to hire on account of sex, or paying less for the same work, or imposing more onerous duties for the same pay. In each such case, the employer violates Title VII by offering terms and conditions to employees of one gender that are less favorable than those it offers to employees of the other gender. Sexual harassment, if committed or tolerated by the employer, becomes a new and onerous term of employment.

■ Sexual harassment falls into two major categories: hostile work environment and quid pro quo. *See* EEOC, Policy Guidance on Sexual Harassment, 8 BNA FEP Manual 405:6681 (Mar. 19, 1990) (hereinafter EEOC Policy Guide). A hostile work environment claim involves a workplace atmosphere so discriminatory and abusive that it unreasonably interferes with the job performance of those harassed. A quid pro quo claim, as the name implies, occurs when a supervisor demands sexual favors in return for a job benefit. *See generally* Barbara Lindemann & David D. Kadue, *Sexual Harassment in Employment Law* (1992). Additionally, employees who are subject to adverse employment actions because they lodged complaints of sexual harassment can raise a retaliation claim under Title VII. *See id.* at 275. Brooks alleges she suffered hostile work environment harassment during her encounter with Selvaggio, and retaliation by the city when she returned from the leave of absence precipitated by the incident.

### Hostile Work Environment

■ In order to prevail on her hostile work environment claim, Brooks must show that her "workplace [was] permeated with discriminatory intimidation ... that [was] sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment." *Harris*, 510 U.S. at 21, 114 S.Ct. 367 (internal quotation marks and citations omitted). "The working environment must both subjectively and objectively be perceived as abusive." *Fuller v. City of Oakland*, 47 F.3d 1522, 1527 (9th Cir.1995) (citing *Harris*, 510 U.S. at 21–22, 114 S.Ct. 367). We use a totality of the circumstances test to determine whether a plaintiff's allegations make out a colorable claim of hostile work environment. *See Harris*,

3. *See Beyda v. City of Los Angeles*, 65 Cal. App.4th 511, 517, 76 Cal.Rptr.2d 547 (Cal.Ct. App.1998) ("Although the wording of title VII differs in some particulars from the wording of FEHA, the antidiscriminatory objectives and overriding public policy purposes of the two acts are identical. In an area of emerging law, such as employment discrimination, it is appropriate to consider federal cases interpreting title VII.") (internal quotation marks and citations omitted); *Okoli v. Lock-* *heed Tech. Operations Co.*, 36 Cal.App.4th 1607, 1614 n. 3, 43 Cal.Rptr.2d 57 (Cal.Ct. App.1995) ("Since the antidiscrimination objectives and public policy purposes of [FEHA and Title VII] are the same, we may rely on federal decisions to interpret analogous parts of the state statute.") (quoting *Sandhu v. Lockheed Missiles & Space Co.*, 26 Cal.App.4th 846, 851, 31 Cal.Rptr.2d 617 (Cal.Ct.App. 1994)).

510 U.S. at 23, 114 S.Ct. 367. *Harris* lists frequency, severity and level of interference with work performance among the factors particularly relevant to the inquiry. When assessing the objective portion of a plaintiff's claim, we assume the perspective of the reasonable victim. *See Ellison v. Brady*, 924 F.2d 872, 879 (9th Cir.1991) ("[A] female plaintiff states a prima facie case of hostile environment sexual harassment when she alleges conduct which a reasonable woman would consider sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment.") (footnotes and citation omitted).

▉ Brooks claims the incident pervaded her work environment to such a degree that she required psychological help and even then was unable to successfully return to her job. She has alleged sufficient facts to support the subjective portion of her hostile work environment claim. The question remains whether her apprehension was objectively reasonable.

Because only the employer can change the terms and conditions of employment, an isolated incident of harassment by a co-worker will rarely (if ever) give rise to a reasonable fear that sexual harassment has become a permanent feature of the employment relationship. By hypothesis, the employer will have had no advance notice and therefore cannot have sanctioned the harassment beforehand. And, if the employer takes appropriate corrective action, it will not have ratified the conduct. In such circumstances, it becomes difficult to say that a reasonable victim would feel that the terms and conditions of her employment have changed as a result of the misconduct.[4]

▉ Which is why Selvaggio's conduct, while relevant, is not the primary focus of our inquiry. No one could reasonably dispute that what Selvaggio did was egregious; he was, after all, immediately removed from his job and prosecuted. He spent time in jail. But it is the city, and not Selvaggio, who is the defendant here. To hold her employer liable for sexual harassment under Title VII, Brooks must show that she reasonably feared she would be subject to such misconduct in the future because the city encouraged or tolerated Selvaggio's harassment.

▉ In support of her claim, Brooks points to Selvaggio's previous inappropriate advances toward female employees, in addition to her own encounter with him in the Communications Center. However, Brooks cannot rely on Selvaggio's misconduct with other female employees because she did not know about it at the time of Selvaggio's attack. Harassment directed towards others of which an employee is unaware can, naturally, have no bearing on whether she reasonably considered her working environment abusive. This is especially true where the harassment comes from an individual who is terminated as soon as his misdeeds come to light.

Brooks next attempts to morph Selvaggio's single assault into a course of conduct by claiming that each of his improper touchings constituted a separate incident. While Selvaggio did touch Brooks inappropriately on her stomach and breast, this happened within the course of a few minutes and was part of a single episode. Additionally, Selvaggio had no chance to become bolder because the city removed him from the workplace once his actions were uncovered. No reasonable woman in Brooks's position would believe that Selvaggio's misconduct had permanently altered the terms or conditions of her employment.

4. A case involving a single incident of sexual harassment is obviously distinct from one involving a series of incidents, which the employer knows about and does nothing to correct. In such circumstances, the non-action by the employer can fairly be characterized as acquiescence, i.e., having changed the terms and conditions of employment to include putting up with harassment from other employees. *See, e.g., Hostetler v. Quality Dining, Inc.*, 218 F.3d 798, 802–05 (7th Cir.2000).

■ The single case Brooks cites to the contrary, *Al–Dabbagh v. Greenpeace, Inc.*, 873 F.Supp. 1105, 1111 (N.D.Ill.1994), holds only that a plaintiff can demonstrate the *subjective* element of a hostile work environment claim based on a single incident, even though she lacked knowledge of the offender's past misconduct. *Al–Dabbagh* did not rely on the perpetrator's past misconduct to establish an objectively hostile working environment, except to the extent the employer failed to discipline him for incidents of which it had knowl- edge.[5] Even were we to assume that the city's knowledge is relevant to establishing a hostile work environment, *but see* note 5 *supra*, Selvaggio's conduct was not known to the city until after the assault.[6] Brooks therefore can rely only on the single instance of sexual harassment directed toward her to support her hostile work environment claim.

■ We need not decide whether a single instance of sexual harassment can ever be sufficient to establish a hostile

5. The objective portion of Al–Dabbagh's claim was based on the severity of the incident plus negligence on the part of the employer, Greenpeace:

> Al–Dabbagh alleges that Greenpeace had turned a blind eye to Mitchell's sexual abuse of female employees in its Chicago office before she fell victim to it and consequently suffered grave bodily and psychological injury. As already stated, Greenpeace's single response to Mitchell's earlier conduct-an oral reprimand for his drinking-fell far short of addressing the more serious problems posed by his conduct. There is no question that those allegations, credited as they must be on the present motion, amply support the first (objective) element of a hostile-environment claim-the evaluation of Mitchell's conduct by a reasonable person.

*Al–Dabbagh*, 873 F.Supp. at 1111. It is unclear why past misconduct of which the complainant is unaware can contribute to a hostile work environment simply because the employer is negligent in disciplining the employee who committed the misconduct. The lack of sufficient discipline for an earlier and unknown act of misconduct does not, after all, make the later misconduct more severe or pervasive with respect to the harassed employee. Lack of adequate discipline might be a relevant consideration in assessing the employer's liability once a hostile work environment is shown to exist, but it seems to have no logical bearing on whether there is a hostile work environment in the first place.

6. Brooks claims that knowledge of Selvaggio's conduct can be imputed to the city because Pat P. knew of it (indeed was a victim) and was a supervisor by virtue of her position as a senior dispatcher. Brooks relies on *Lamb v. Household Credit Servs.*, 956 F.Supp. 1511 (N.D.Cal.1997), for the proposition that an employer is deemed to know of harassment of which a supervisor is aware.

The city also relies on *Lamb*. It points to language indicating that supervisors, as that term is defined for Title VII purposes, are only those who have authority to "hire, fire, or discipline employees, or recommend such action." *Id.* at 1517. It is undisputed that senior dispatchers lacked the authority to hire and fire dispatchers. While there is a vague reference to senior dispatchers assisting with disciplinary measures, this is not sufficient. *See id.* at 1517 (finding work flow supervisor with "limited set of purely ministerial employee training and monitoring" functions not to be a supervisor for Title VII purposes).

*Lamb* also provides for imputation where an employee who has "general responsibility for passing employment-related complaints up the corporate hierarchy" receives a complaint of harassment. *See id.* at 1516 (citing *Llewellyn v. Celanese Corp.*, 693 F.Supp. 369, 380 (W.D.N.C.1988)). While senior dispatchers do have this responsibility, *Lamb* confines the responsibility of these non-management employees. *See id.* at 1517:

> [F]or purposes of Title VII, "management-level employees" encompass ... non-management employees charged with substantial responsibility for relaying employee complaints to management, particularly where management is located away from the workplace. If a co-worker has knowledge of a harassee's complaint, but that co-worker lacks authority to counsel, investigate, suspend, or fire the accused harasser, or to change the conditions of the harassee's employment, the co-worker's inaction does not spark employer liability unless that co-worker has an official or strong de facto duty to act as a conduit to management for complaints about work conditions.

Because Pat P., as a Senior Dispatcher, lacked power to change the conditions of employment, did not serve as a conduit to off-site managers and never actually received a formal complaint about Selvaggio, her knowledge of his conduct cannot be imputed to the city.

work environment.[7] As we have previously held, "the required showing of severity or seriousness of the harassing conduct varies inversely with the pervasiveness or frequency of the conduct." *Ellison*, 924 F.2d at 878 (citing *King v. Board of Regents*, 898 F.2d 533, 537 (7th Cir.1990)). If a single incident can ever suffice to support a hostile work environment claim, the incident must be extremely severe. *See* EEOC Policy Guide, page 6 *supra*, at 405:6690–91 ("[A] single unusually severe incident of harassment may be sufficient to constitute a Title VII violation; the more severe the harassment, the less need to show a repetitive series of incidents. This is particularly true when the harassment is physical."). In *Al–Dabbagh*, a single incident was held to be sufficient where the assailant "slapped [plaintiff], tore off her shirt, beat her, hit her on the head with a radio, choked her with a phone cord and ultimately forced her to have sex with him." *Al–Dabbagh*, 873 F.Supp. at 1108. The perpetrator held the victim captive overnight; when she finally managed to escape, she had to be hospitalized for her injuries. *See id.*

 If the incident here were as severe as that in *Al–Dabbagh*, we would have to grapple with the difficult question whether a single incident can so permeate the workplace as to support a hostile work environment claim. Because the incident here was much less severe, we need not answer that question. Brooks did not allege that she sought or required hospitalization; indeed, she did not suffer any physical injuries at all. The brief encounter between Brooks and Selvaggio was highly offensive, but nothing like the ordeal suffered by the unfortunate young woman in *Al–Dabbagh*, who was held captive from evening until early the next morning. Utilizing the *Harris* factors of frequency, severity and intensity of interference with working conditions, we cannot say that a reasonable woman in Brooks's position would consider the terms and conditions of her employment altered by Selvaggio's actions.[8] Brooks was harassed on a single occasion for a matter of minutes in a way that did not impair her ability to do her job in the long-term, especially given that the city took prompt steps to remove Selvaggio from the workplace.

Selvaggio's conduct is akin to that reported in cases where plaintiff was held *not* to have alleged harassment severe enough to support a hostile work environment claim. *See, e.g., Candelore v. Clark County Sanitation Dist.*, 975 F.2d 588, 590 (9th Cir.1992) (per curiam) ("[I]solated incidents of sexual horseplay alleged by Candelore took place over a period of years and were not so egregious as to render Candelore's work environment 'hostile.' ") (quoting *Jordan v. Clark*, 847 F.2d 1368, 1374–75 (9th Cir.1988)); *Del Valle Fontanez v. Aponte*, 660 F.Supp. 145, 146–47, 149 (D.P.R.1987) (finding a single incident where defendant "pressed [plaintiff] against the door with his body" and plaintiff "felt defendant's erect sexual organ against her body" twice in a five minute period not severe or pervasive enough to create a hostile working environment);

7. *See Brown v. Hot, Sexy & Safer Prods., Inc.*, 68 F.3d 525, 541 n. 13 (1st Cir.1995) ("We do not hold that a one-time episode is *per se* incapable of sustaining a hostile environment claim. The frequency of the alleged harassment is a significant factor, but only one of many to be considered in determining whether the conduct was sufficiently severe or pervasive that a reasonable person would find that it had rendered the environment hostile or abusive.") (internal quotation marks omitted).

8. *But see* EEOC Policy Guide, page 6 *supra*, at 405:6691 ("The Commission will presume that the unwelcome, intentional touching of a charging party's intimate body areas is sufficiently offensive to alter the conditions of her working environment and constitute a violation of Title VII.") We are not convinced that such a presumption is consistent with the Supreme Court's totality of the circumstances test approach in *Harris*. Nevertheless, even were we to adopt this presumption, the brief duration of the incident coupled with the city's effective remedial action would suffice to rebut it.

*see also Saxton v. American Tel. & Tele-graph Co.,* 10 F.3d 526, 528, 534 (7th Cir. 1993) (finding insufficient harassment to constitute a hostile work environment where plaintiff was rubbed and kissed on one occasion, and resisted an attempted groping on another).

*Ellison* is not to the contrary. Ellison alleged a sustained campaign of harassing conduct directed at her. *See Ellison,* 924 F.2d at 873–75 (recounting alleged harassment including love letters and date requests after plaintiff made it known that advances were unwelcome). Additionally, the course of conduct alleged by Ellison became more intense over time. Gray, the harasser, started by asking Ellison out a few times. He then sent her a brief love note followed by two letters. One of these comprised three single-spaced typed pages, and the other was sent after Gray had been told by his supervisors to cease his behavior. *See id.* Because Gray had continually ratcheted up the intensity of his advances, a reasonable woman could fear that this pattern would continue for as long as they were working in the same office. Nor did Ellison's employer effectively address Gray's behavior. After a brief transfer, Gray was again assigned to work with Ellison. Ellison's working environment, characterized by a pattern of increasingly intense sexual advances from a co-worker and inadequate employer responses to her complaints, could cause a reasonable woman to believe that tolerating harassing behavior had become a term or condition of her employment.

Our holding in no way condones Selvaggio's actions. Quite the opposite: The conduct of which Brooks complains was highly reprehensible. But, while Selvaggio clearly harassed Brooks as she tried to do her job, "not all workplace conduct that may be described as harassment affects a term, condition, or privilege of employment within the meaning of Title VII." *Meritor Sav. Bank v. Vinson,* 477 U.S. 57, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986) (internal quotation marks and citation omitted). The harassment here was an entirely isolated incident. It had no precursors, and it was never repeated. In no sense can it be said that the city imposed upon Brooks the onerous terms of employment for which Title VII offers a remedy.[9] *See Faragher v. City of Boca Raton,* 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) ("[T]hese standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a 'general civility code.' ") (quoting *Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 80, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998)). We therefore affirm the district court's grant of summary judgment with respect to Brooks's hostile work environment claims under Title VII and FEHA.[10]

### Retaliation

Six months after Selvaggio assaulted her, Brooks returned to work. While Sel-

9. A different question would arise if Selvaggio were Brooks's supervisor, rather than her co-worker. Because the employer cloaks the supervisor with authority, we ordinarily attribute the supervisor's conduct directly to the employer. *See Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 765, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998). Thus, a sexual assault by a supervisor, even on a single occasion, may well be sufficiently severe so as to alter the conditions of employment and give rise to a hostile work environment claim.

10. Brooks also argues that the city is liable for its failure to take remedial steps once it had knowledge, through Pat P., of Selvaggio's prior offending conduct. She relies on *Fuller v. City of Oakland,* 47 F.3d 1522 (9th Cir. 1995), to support her claim. But, as we have noted, senior dispatchers are not supervisors whose knowledge can be imputed to the city. *See* note 6 *supra.* In any case, *Fuller* does not establish a cause of action that is separate from that for a hostile work environment or quid pro quo harassment. It simply defines the liability of employers. "[I]f a hostile work environment *exists,* an employer is only liable for failing to remedy harassment of which it knows or should know." *Id.* at 1527 (quoting *Ellison,* 924 F.2d at 881). As there was no actionable sexual harassment, there is no liability to assign to the city.

vaggio had resigned under threat of termination, Brooks claims she returned to a very different workplace than the one she had left. Brooks initially noticed that her coworkers shunned her. Specifically, the males in the office refused to speak to her about anything other than work. She also saw pictures of Selvaggio in the Dispatch Center photo album, which were removed on her demand. Additionally, the city took its full 90 days to process Brooks's worker's compensation claim. Later, she was required to attend group therapy sessions and discuss the incident in front of coworkers. She had problems getting the shift she had when she took her leave of absence; was assigned to work with another dispatcher, Mike C., who had been close to Selvaggio and allegedly became openly hostile to Brooks; and had difficulty securing vacation time. According to Brooks, this treatment culminated in an unfavorable job evaluation.

■ We recently set out the peculiar dynamics of a retaliation claim under Title VII in *Payne v. Norwest Corp.*, 113 F.3d 1079 (9th Cir.1997). We noted that a plaintiff must show (1) involvement in a protected activity, (2) an adverse employment action and (3) a causal link between the two. *See id.* at 1080. Thereafter, the burden of production shifts to the employer to present legitimate reasons for the adverse employment action. Once the employer carries this burden, plaintiff must demonstrate a genuine issue of material fact as to whether the reason advanced by the employer was a pretext. *See id.* Only then does the case proceed beyond the summary judgment stage. We examine FEHA claims under the same burden-shifting structure. *See Flait v. North Am. Watch Corp.*, 3 Cal.App.4th 467, 476, 4 Cal.Rptr.2d 522 (Cal.Ct.App.1992).

■ Asserting one's civil rights, as Brooks did by complaining of Selvaggio's conduct, is a protected activity under Title VII and FEHA. *See EEOC v. Crown Zellerbach Corp.*, 720 F.2d 1008, 1013 (9th Cir.1983); *Blom v. N.G.K. Spark Plugs (USA), Inc.*, 3 Cal.App.4th 382, 388, 4 Cal.Rptr.2d 139 (Cal.Ct.App.1992). Brooks's complaint about Selvaggio's harassment thus satisfies the first step of our inquiry.

■ The next question is whether Brooks alleged that she was subjected to an adverse employment action. In *Strother v. Southern Cal. Permanente Med. Group*, 79 F.3d 859 (9th Cir.1996), we noted that "[n]ot every employment decision amounts to an adverse employment action." *Id.* at 869. We recognize the countervailing concerns in this area of the law. On the one hand, we worry that employers will be paralyzed into inaction once an employee has lodged a complaint under Title VII, making such a complaint tantamount to a "get out of jail free" card for employees engaged in job misconduct. On the other hand, we are concerned about the chilling effect on employee complaints resulting from an employer's retaliatory actions. In an effort to strike the proper balance, we have held that only non-trivial employment actions that would deter reasonable employees from complaining about Title VII violations will constitute actionable retaliation. *See Ray v. Henderson*, 217 F.3d 1234, 1243 (9th Cir.2000) ("[A]n action is cognizable as an adverse employment action if it is reasonably likely to deter employees from engaging in protected activity."). Among those employment decisions that can constitute an adverse employment action are termination, dissemination of a negative employment reference, issuance of an undeserved negative performance review and refusal to consider for promotion.[11] By contrast, we have held that declining to hold a job open for

11. *See O'Day v. McDonnell Douglas Helicopter Co.*, 79 F.3d 756, 763 (9th Cir.1996) (termination); *Hashimoto v. Dalton*, 118 F.3d 671, 676 (9th Cir.1997) (negative reference); *Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir.1987) (negative performance reviews); *Ruggles v. California Polytechnic State Univ.*, 797 F.2d 782, 786 (9th Cir.1986) (refusing to consider for promotion).

an employee and badmouthing an employee outside the job reference context do not constitute adverse employment actions.[12] With these principles in mind, we examine Brooks's allegations of retaliatory treatment by the city.

■ Because an employer cannot force employees to socialize with one another, ostracism suffered at the hands of coworkers cannot constitute an adverse employment action. *See Strother*, 79 F.3d at 869 ("[M]ere ostracism in the workplace is not enough to show an adverse employment decision.") (citing *Fisher v. San Pedro Peninsula Hosp.*, 214 Cal.App.3d 590, 615, 262 Cal.Rptr. 842 (Cal.Ct.App.1989)). Indeed, holding an employer liable because its employees refuse to associate with each other might well be unconstitutional: "The First Amendment prevents the government, except in the most compelling circumstances, from wielding its power to interfere with its employees' freedom to believe and associate." *DiRuzza v. County of Tehama*, 206 F.3d 1304, 1308 (9th Cir.2000) (quoting *Rutan v. Republican Party of Ill.*, 497 U.S. 62, 76, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990)).

■ The group therapy sessions about which Brooks complains were workshops designed to better inform the city's workforce of its sexual harassment policy. Brooks does not claim she was singled out for the sessions, as all city employees were required to participate in them. Her complaint seems to boil down to the non-private character of the sessions. But the employer has an interest in educating its employees about the adverse effects of misconduct that has occurred in the workplace. An employer's legitimate effort to deal with a traumatic workplace situation and educate its employees regarding sexual harassment cannot be the basis for a retaliation claim under Title VII.

■ Next, we turn to Brooks's claims that she was scheduled with a coworker, Mike C., who was openly hostile to her. While this might be an adverse employment action under certain circumstances, the undisputed facts demonstrate that it was not here. Brooks was never scheduled to work with Mike C. He was sometimes on the dispatch floor when she worked, but Brooks has presented no evidence that the city put the two of them together knowing that Brooks would be uncomfortable. Nor did Brooks present evidence that Mike C. was openly hostile, or hostile at all, toward her. She admits that he showed her no animus, nor did he express skepticism to her about her account as to what happened with Selvaggio. While it appears that Mike C. had been friendly with Selvaggio, a victim of sexual harassment is not entitled to avoid contact with the harasser's friends. So long as they show no outward signs of hostility, they are entitled to continue doing their jobs even though it brings them in contact with the victim.

■ As for the fact that the city used all of its allotted 90 days to process the worker's compensation claim, Brooks offers no evidence that the city treated her differently from other employees seeking workers' compensation benefits. Absent a showing of disparate treatment, the city's delay cannot be deemed retaliatory.

■ Brooks also alleges that her performance review was downgraded from "satisfactory" to "needs improvement" because of her complaint about Selvaggio. We have previously held that an undeserved negative performance review can constitute an adverse employment decision. *See Yartzoff*, 809 F.2d at 1376 ("Transfers of job duties and undeserved performance ratings, if proven, would constitute 'adverse employment decisions' cognizable under [Title VII].") (citation omitted). Nevertheless, the evaluation here

---

**12.** *See McAlindin v. County of San Diego*, 192 F.3d 1226, 1238–39 (9th Cir.1999) (refusing to hold job open for employee); *Nunez v. City of Los Angeles*, 147 F.3d 867, 875 (9th Cir. 1998) (badmouthing).

was not an adverse employment action because it was subject to modification by the city. Brooks refused to accept the review and appealed, but she abandoned her job while the appeal was pending. Because the evaluation could well have been changed on appeal, it was not sufficiently final to constitute an adverse employment action. *Cf. Dobbs–Weinstein v. Vanderbilt Univ.*, 185 F.3d 542, 546 (6th Cir.1999) ("Dobbs–Weinstein succeeded in the grievance process, and Vanderbilt's final decision was to grant her tenure. She has not here suffered a final or lasting adverse employment action sufficient to create a prima facie case of employment discrimination under Title VII. To rule otherwise would be to encourage litigation before the employer has an opportunity to correct through internal grievance procedures any wrong it may have committed.").

■ Finally, Brooks claims that the city rescheduled her to an unfavorable shift and denied her vacation preference. However, like the evaluation, these actions were not final. When Brooks complained, the city accommodated her preferences by allowing her to switch shifts and vacation dates with other employees.[13] The district court did not err in rejecting Brooks's retaliation claim.

## III

■ Brooks alludes briefly in her moving papers to a constructive discharge theory citing *Turner v. Anheuser–Busch, Inc.*, 7 Cal.4th 1238, 32 Cal.Rptr.2d 223, 876 P.2d 1022 (1994), and *Watson v. Nationwide Ins., Co.*, 823 F.2d 360 (9th Cir.1987). As explained in *Turner*, constructive discharge occurs when the working conditions deteriorate, as a result of discrimination, to the point that they become "sufficiently extraordinary and egregious to overcome

the normal motivation of a competent, diligent, and reasonable employee to remain on the job to earn a livelihood and to serve his or her employer." *Turner*, 7 Cal.4th at 1246, 32 Cal.Rptr.2d 223, 876 P.2d 1022; *see also Watson*, 823 F.2d at 361 (noting that constructive discharge is found where a working environment is "so intolerable and discriminatory as to justify a reasonable employee's decision [to leave]"); EEOC Policy Guide, page 6 *supra*, at 405:6693 ("[A]n employer is liable for constructive discharge when it imposes intolerable working conditions [which] foreseeably would compel a reasonable employee to quit....").

■ Brooks's complaints about her working conditions range from the trivial, such as issues with the pictures of Selvaggio in the dispatch center photo album, to the routine, such as scheduling conflicts. Taken collectively, these circumstances are not sufficiently extraordinary or egregious to amount to a constructive discharge.

■ While *Watson* holds that the determination of whether working conditions are sufficiently egregious to support a constructive discharge theory is usually a jury question, *see Watson*, 823 F.2d at 361, the district court did not err in deciding that Brooks's claim fails as a matter of law. Taking the evidence in the light most favorable to Brooks, we cannot see how a reasonable trier of fact could find that she was driven from the workplace. Where a plaintiff fails to demonstrate the severe or pervasive harassment necessary to support a hostile work environment claim, it will be impossible for her to meet the higher standard of constructive discharge: conditions so intolerable that a reasonable person would leave the job. *Cf. Thomas v. Douglas*, 877 F.2d 1428, 1434 (9th Cir.1989) (constructive discharge requires some ag-

---

**13.** Brooks also alleges that, after she complained about Selvaggio, certain police officers refused to provide her services that were routinely provided to other dispatchers. However, the police did not employ Brooks and cannot be held liable for retaliating against her. *See City of Los Angeles, Dept. of Water & Power v. Manhart*, 435 U.S. 702, 718 n. 33, 98 S.Ct. 1370, 55 L.Ed.2d 657 (1978) ("Title VII ... primarily govern[s] relations between employees and their employer, not between employees and third parties.").

gravating factors, such as a continuous pattern of discriminatory treatment).

**AFFIRMED.**