Jayme PAYNE, Plaintiff,

v.

APOLLO COLLEGE—PORTLAND, INC., Defendant.

No. CIV. 03–915–AS.

United States District Court, D. Oregon.

July 26, 2004.

Kerry M. L. Smith, Smith & Fjelstad, Gresham, OR, for Plaintiff.

Sonja Leneice Henning, Lynda J. Hartzell, Tonkon Torp LLP, Portland, OR, for Defendant.

## OPINION AND ORDER

ASHMANSKAS, United States Magistrate Judge.

Plaintiff alleges claims of sexual harassment and retaliation under state and federal law against her former employer, Apollo College—Portland, Inc. Currently before the court is defendant's motion for full or partial summary judgment (docket No. 26).

## BACKGROUND

Defendant seeks summary judgment on the following issues: (1) whether plaintiff can prove a *prima facie* case of sexual harassment; (2) whether liability for sexual harassment can be imputed to defendant; (3) whether plaintiff can prove a *prima facie* case of retaliation; and (4) whether plaintiff should be allowed to pursue punitive damages. Plaintiff has agreed to dismiss her previously asserted wage claim.

## SUMMARY JUDGMENT STANDARD

Rule 56 of the Federal Rules of Civil Procedure allows the granting of summary judgment:

if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed.R.Civ.P. 56(c). "[T]he requirement is that there be no *genuine* issue of *material* fact." *Anthes v. Transworld Systems, Inc.*, 765 F.Supp. 162, 165 (D.Del.1991) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986))(emphasis in original).

The movant has the initial burden of establishing that no genuine issue of material fact exists or that a material fact essential to the nonmovant's claim is absent. *Celotex v. Catrett*, 477 U.S. 317, 322–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the movant has met its burden, the onus is on the nonmovant to establish that there is a genuine issue of material fact. *Id.* at 324, 106 S.Ct. 2548. In order to meet this burden, the nonmovant "may not rest upon the mere allegations or denials of [its] pleadings," but must instead "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); see *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548.

An issue of fact is material if, under the substantive law of the case, resolution of the factual dispute could effect the outcome of the case. *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. Factual disputes are genuine if they "properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250, 106 S.Ct. 2505. On the other hand, if after the court has drawn all reasonable inferences in favor of the non-moving party, "the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249–50, 106 S.Ct. 2505 (citations omitted).

## PRELIMINARY MATTERS

Defendant asserts that certain evidence upon which plaintiff seeks to rely is inadmissible. Defendant moves to strike the following portions of plaintiff's affidavit on grounds of hearsay: (1) in paragraph 11 (statement by Mr. Boetel); (2) in paragraph 12 (statements by Susan Forsythe); (3) in paragraph 15 (statements by and about Darla Tverberg and Robert Cios' alleged conversation with her); (4) in paragraph 21 (statements regarding conversations with Ms. Forsythe and her alleged state of mind); (5) in paragraph 31 (statements by Steve Nestor's secretary).

Hearsay, an out of court statement offered to prove the truth of the matter asserted, is inadmissible. Fed.R.Evid. 801, 802. Each of the challenged portions of plaintiff's affidavit are hearsay and are not otherwise admissible under the Federal Rules of Evidence. Consequently, these portions of plaintiff's affidavit are stricken and are not part of the summary judgment record.

Defendant also asserts that certain portions of plaintiff's affidavit are inadmissible on the ground that testimony in her affidavit is inconsistent with her prior sworn testimony. The Ninth Circuit has held that an issue of fact cannot be created by an affidavit that contradicts prior deposition testimony. *Foster v. Arcata Assoc., Inc.*, 772 F.2d 1453, 1462 (9th Cir.1985), *cert. denied,* 475 U.S. 1048, 106 S.Ct. 1267, 89 L.Ed.2d 576 (1986); *Radobenko v. Automated Equipment Corp.*, 520 F.2d 540, 543–44 (9th Cir.1975). *Kennedy v. Allied Mutual Ins. Co.* has subsequently limited that holding:

"the *Foster–Radobenko* rule does not automatically dispose of every case in which a contradictory affidavit is introduced to explain portions of earlier deposition testimony. Rather, the *Radobenko* court was concerned with 'sham' testimony that flatly contradicts earlier testimony in an attempt to 'create' an issue of fact and avoid summary judgment. Therefore, before applying the *Radobenko* sanction, the district court must make a factual determination that the contradiction was actually a 'sham'." 952 F.2d 262, 266–67 (9th Cir.1991).

To the extent there may be discrepancies between plaintiff's affidavit and her prior sworn testimony, the affidavit testimony does not "flatly contradict" the deposition testimony and does not appear to have been made for the purpose of creating an issue of material fact. Plaintiff's affidavit is not a sham, and the *Radobenko* sanction does not apply. Thus, the challenged excerpts of plaintiff's affidavit will remain part of the summary judgment record.

Plaintiff argues that defendant's employee handbook, which contains a policy against workplace sexual harassment, is irrelevant because it was modified after the events that gave rise to plaintiffs' claims. The handbook, however, indicates that the relevant portion, the policy against workplace harassment, was not modified after the events that gave rise to plaintiff's claims. Affidavit of Lynda J. Hartzell ("Hartzell Aff."), Ex. 6, p. 25. Consequently, the handbook will be included in the summary judgment record.

## FACTS

Plaintiff worked for defendant during two different periods. Her claim arose during her second period of employment, which was from January 2000 to April 15, 2003, when she resigned. Plaintiff worked as a front office receptionist and administrative assistant to the Campus Director. Prior to his termination, on August 7, 2002, Robert Cios was the Campus Director and plaintiff's supervisor.

On May 30 or 31, 2002, plaintiff told Cios that she needed a second job and had

thought about working as a cocktail waitress. Cios responded that plaintiff should be a strip dancer because she had a nice body and men would pay to see her dance. Concise Statement of Facts in Support of Motion for Summary Judgment ("Defendant's Facts"), ¶ 6; Plaintiff's Response to Defendant's Concise Statement of Material Facts ("Plaintiff's Facts"), ¶ 6.

On June 3, 2002, while Cios and plaintiff were working together on a report, Cios rubbed plaintiff's thigh and said, "that feels nice." Defendant's Facts, ¶ 9; Plaintiff's Facts, ¶ 9. This touching lasted thirty seconds to one minute, and then plaintiff moved her leg. Defendant's Facts, ¶ 10; Plaintiff's Facts, ¶ 10. Until this incident, plaintiff admitted that her working relationship with Cios was excellent and the work environment was professional. Defendant's Facts, ¶ 3; Plaintiff's Facts, ¶ 3.

On June 4, 2002, plaintiff's then boyfriend, Lance Boetel, contacted Steve Nestor, President of Apollo College, Inc., to report the June 3rd touching incident. Defendant's Facts, ¶ 14; Plaintiff's Facts, ¶ 14. On June 4, 2002, Steve Nestor assured plaintiff that he would conduct a prompt investigation of her allegations against Cios. Plaintiff assured Mr. Nestor that she could continue to perform her job and work with Cios. Defendant's Facts, ¶ 15; Plaintiff's Facts, ¶ 15. Plaintiff did not want defendant to fire Cios over this incident. Defendant's Facts, ¶ 13; Plaintiff's Facts, ¶ 13.

On June 5, 2002, Cindy Nestor, Secretary/Treasurer of Apollo College, Inc., contacted plaintiff to investigate the allegations. Cindy Nestor's interview with plaintiff was taped, transcribed and sent to plaintiff to review, correct and comment. Defendant's Facts, ¶ 16; Plaintiff's Facts, ¶ 16. In addition to the two incidents described above, in response to the question, "Has Mr. Cios ever in your presence made other comments or engaged in other be-haviors that you considered to be of a sexual nature?", plaintiff stated that Cios "would just occasionally touch my hand or if he was walking behind me, he would brush his hand up against my side, or across my back, or like every once in a while ... like a neck massage." Hartzell Aff., Ex. 8, pp. 4–5. Plaintiff could not remember any specific dates, but stated that "it happened periodically, but I just kind of blew it off ... but ... when this last event happened, I just felt it went too far. I would never have mentioned anything if it hadn't been for Lance calling." Id., p. 5. When asked for details, plaintiff recounted, "a couple of months ago, we were in the lounge. I am trying to think of who was in there with us ... something happened and then Bob gave me a hug. It was Donna Wartella. She made the comment ... 'oh is that what I have to do to get a hug.'" Id. Plaintiff stated that she never discussed any of these behaviors with Cios—that they "would just laugh and blow it off, so he didn't think it bothered me, but it did." Id.

On June 4, 2002, Steve Nestor conducted an interview with Cios, which was taped, transcribed and sent to Cios to review. Steve Nestor told Cios not to discuss the allegations or investigation with anyone, including plaintiff. Defendant's Facts, ¶¶ 18, 19. In addition to the incidents of May 30 or 31 and June 3, 2002, Steve Nestor asked Cios if he recalled hugging plaintiff in the staff lounge or any other incidents of touching plaintiff. He did not remember hugging plaintiff or admit any other instances of touching plaintiff except, possibly grabbing her arm in passing. Hartzell Aff., Ex. 3, pp. 3–4.

On or about June 18 or 19, 2002, Cios approached plaintiff to discuss her allegations of sexual harassment and his concerns about the effects on his job and family. Defendant's Facts, ¶ 17; Plain-

tiff's Facts, ¶ 17. On or about June 19, 2002, Steve Nestor learned of Cios' breach of the confidentiality directive. Defendant's Facts, ¶ 20. In comments to the transcript of her interview with Cindy Nestor, plaintiff reported that Cios had raised the allegations in a discussion with plaintiff. Hartzell Aff., Ex. 8, pp. 7–8. Cios was terminated on August 7, 2002, for breaching the confidentiality directive. Defendant's Facts, ¶ 21; Plaintiff's Facts, ¶ 21. Plaintiff had been able to work with Cios between June 2, 2002, and August 7, 2002, and was upset when he was terminated. Defendant's Facts, ¶¶ 22, 23; Plaintiff's Facts, ¶¶ 22, 23.

After Cios' termination, on August 9, 2002, Donna Wartella, an admissions representative, was plaintiff's supervisor.[1] Defendant's Facts, ¶ 28; Plaintiff's Facts, ¶ 28. In the comments to her interview transcript, plaintiff had reported that she believed Donna Wartella knew about plaintiff's allegations against Cios. Hartzell Aff., Ex. 8, p. 8. On August 7, 2002, plaintiff expressed to 'Steve Nestor her belief that Wartella knew about the allegations and her concern about how that would effect Wartella's ability to manage the front desk staff. Declaration of Kerry M.L. Smith in Support of Plaintiff's Response to Defendant's Motion for Summary Judgment ("Smith Dec."), Ex. A, pp. 18, 41 (S. Nestor Dep., Ex. 11). Prior to Cios' termination, however, plaintiff's relationship with Wartella was fine. Defendant's Facts, ¶ 29; Plaintiff's Facts, ¶ 29.

There is evidence that Wartella had been compiling a list of shortcomings in plaintiff's work performance since August 5, 2002. Smith Dec., Ex. E, pp. 5, 8–9 (Wartella Dep., Ex. 9). On August 9, 2002, Cindy Nestor instructed Wartella to issue a written warning to plaintiff, which listed

nine infractions, many in regard to plaintiff's attendance. Defendant's Facts, ¶¶ 35.a, 48; Plaintiff's Facts, ¶¶ 35, 48. Wartella threatened plaintiff's job. Defendant's Facts, ¶ 46; Plaintiff's Facts, ¶ 46. Plaintiff disagreed with the written discipline and made written comments on it that the infractions were either approved previously by Cios or were otherwise without merit. Payne Dec., Ex. 9. Plaintiff left Cindy Nester a voicemail message that she believed Wartella was retaliating against her. Cindy Nester did not return the call. Payne Dec., ¶ 24.

After plaintiff left the voicemail message for Cindy Nelson, she received a telephone call from Marge Carlson, the Chief Executive Officer of Apollo College, Inc.,[2] who verbally reprimanded plaintiff for deviating from her work schedule and allowing a supervisor to complete her time card. Payne Dec., ¶ 25. On August 12, 2002, Carlson issued a written confirmation of their conversation. *Id.*, Ex. I. On that same date, Carlson issued a "written warning" to plaintiff regarding plaintiff's need to reimburse $70 in student funds for which plaintiff had issued a receipt. *Id.*, ¶ 27, Ex. K. (Policy specified that the employee who issued the receipt was responsible if the funds became missing. Payne Dec., ¶ 27.) Plaintiff responded to both items in writing. She requested clarification on the topic of deviating from her work schedule and contested that she ever allowed a supervisor to punch her time card. *Id.*, ¶ 26, Ex. J. She also asserted that she had previously made arrangements to repay the $70 at a later date. *Id.*, ¶¶ 27, 28, Exs. L, M. In response, Carlson wrote plaintiff an e-mail, which stated that the warnings were "reminders of previous verbal and/or written issues

---

**1.** There is a dispute as to who plaintiff's supervisor was on August 7–8, 2002.

**2.** Marge Carlson founded Apollo College, Inc., in 1976. She is Cindy Nester's mother, and Steve Nester's mother in law.

that have been brought to your attention and have continued. The warnings were meant to counsel and help you. My hope is that you will remain an employee until you are eligible to retire. ..." *Id.,* ¶ 28, Ex. N. Plaintiff printed the e-mail, wrote comments on it, contesting that she had ever previously been counseled about the subject of the warnings, and faxed it back to Carlson. *Id.*

The record indicates that, prior to the incidents with Cios, plaintiff had been counseled about sending sexually explicit e-mail messages to her boyfriend from an e-mail account on a computer she shared with other employees. Defendant's Facts, ¶ 4; Plaintiff's Facts, ¶ 4. Plaintiff admitted that she was tardy to work, possibly as many as ten times during 2002, and that she forgot to punch the time clock periodically. Defendant's Facts, ¶ 41; Plaintiff's Facts, ¶ 41. Plaintiff had been employee of the month in April and May 2002. Plaintiff's Facts, ¶ 51; Reply with Additional Material Facts to Plaintiff's Response to Defendant's Concise Statement of Material Facts in Dispute ("Defendant's Reply Facts"), ¶ 51.

Between August 12 and October 24, 2002, the Portland campus was staffed by two temporary Campus Directors, DeAnne Baker and then De Martin. Defendant's Facts, ¶ 30; Plaintiff's Facts, ¶ 30. On or about October 24, 2002, Micaela Sieracki became the Campus Director for the Portland campus. She supervised plaintiff until plaintiff resigned on April 15, 2003, to take a job with Forrester's Medical Billing Service as an office manager. Defendant's Facts, ¶¶ 31, 33; Plaintiff's Facts, ¶¶ 31, 33. Payne had no problems with her employment under the supervision of Baker, Martin and Sieracki and described her relationship with each as good. Defendant's Facts, ¶ 32; Plaintiff's Facts, ¶ 32. After DeAnne Baker became interim Campus Director, plaintiff's keys to the Director's Office were taken away. Plaintiff could do her job without the keys but asserts that it was more difficult. Defendant's Facts, ¶ 39; Plaintiff's Facts, ¶ 39.

On August 15, 2002, plaintiff sent an e-mail to Cindy Nester asking her to respond to plaintiff's voicemail message of August 9, 2002, in which she complained that she believed Wartella was retaliating against her. Payne Dec., ¶ 29, Ex. O. Cindy Nester forwarded the e-mail to Steve Nester with the remark, "Looks like Jamie [*sic* ] is setting us up again? ? ?" Smith Dec., Ex. B., pp. 16, 21 (C. Nester Dep., Ex. 4).

On August 16, 2002, Campus Director Deanna Baker delivered to plaintiff a letter from Steve Nester in response to plaintiff's concerns about Donna Wartella performing as the front desk supervisor. Payne Dec., ¶ 30, Ex. P. The letter describes Steve Nester's investigation and conclusion that there was no evidence that Wartella knew about the allegations plaintiff made against Cios. The letter states:

"Even if Mr. Cios did discuss the situation between you and him with another employee, Mr. Cios is no longer with the company and no action may be taken against him. Again, if some employee did have knowledge of what you are alleging, you have not provided any claim of how they used the information to break any policy or law. If I am mistaken, please correct my misunderstanding."

*Id.* The letter concludes, "Unless you have something to report, I would appreciate it if you could return to your duties and perform the job responsibilities that I know you are capable of performing. Again, please contact me if I may be of assistance." *Id.*

On August 22, 2002, plaintiff responded to Steve Nester's letter, listing items she considered to be retaliatory. In sum, they

were: (1) Wartella's August 9, 2002, memorandum of infractions and counseling; (2) Carlson's written warning of August 12, 2002; (3) Cindy Nester's failure to respond to plaintiff's voicemail message of August 9, 2002, in which plaintiff asserts she complained of retaliation; (4) comments from Steve Nester and Carlson that plaintiff's work had suffered in the wake of the sexual harassment complaint; (5) a written warning by Deanna Baker on August 20, 2002, when plaintiff came in late after being sick in the morning, though she had not been written up for similar occurrences in the past; (6) Deanna Baker's taking plaintiff's keys to the Director's office on August 12, 2002, while others were allowed to retain their keys; (7) references to prior warnings that had never occur; (8) receipt of three written warnings within two weeks of Cios' termination, though she was employee of the month in April and May 2002; (9) Wartella throwing papers at her on August 19, 2002; (10) her belief that she has been retaliated against in violation of state and federal law; and (11) failure to provide her with a copy of her personnel file. Payne Dec., ¶ 31, Ex. Q.

Steve Nester responded by letter of August 22, 2002. He took issue with many of plaintiff's assertions, most significantly that she complained of retaliation on August 9, 2002. Payne Dec., ¶ 32, Ex. R.

Plaintiff also claims that her annual evaluation and associated pay raise were to have occurred in mid-July 2002. Payne Dec., ¶ 13. The record indicates that plaintiff was on vacation from July 18 until August 5, 2002. Cios was terminated on August 7, 2002. Sieracki, the permanent Campus Director, was not appointed until October 22, 2002. She submitted a partial evaluation of plaintiff on October 30, 2002, which was forwarded to Steve Nester. Payne Dec., ¶ 34. Sieracki performed a complete evaluation of plaintiff on February 20, 2003. Smith Dec., Ex. D, pp. 4, 9–

12 (Sieracki Dep., Ex. 17). Subsequently, Steve Nester approved a retroactive 2% pay increase, though plaintiff previously had received pay increases at a rate of 3%. Payne Dec., ¶ 13, Ex. C. There is evidence that other employees were evaluated and received their raises more quickly than plaintiff. Smith Dec., Ex. D, pp. 6, 23–25 (Sieracki Dep., Ex. 22); pp. 4–5, 13–22 (Sieracki Dep., Ex. 21).

## LEGAL STANDARDS

*Sexual Harassment*

Title VII prohibits employers from discriminating "against any individual with respect to . . . compensation, terms, conditions, or privileges of employment because of such individual's . . . sex . . . ." 42 U.S.C. § 2000e–2(a)(1). Conduct constitutes sexual harassment if it has the purpose of effect of "unreasonably interfering with an individual's work performance or creating and intimidating, hostile, or offensive work environment." 29 C.F.R. § 1604.11(a)(3).

 A hostile work environment exists "[w]hen the workplace is permeated with 'discriminatory intimidation, ridicule and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (quoting *Meritor Sav. Bank FSB v. Vinson,* 477 U.S. 57, 65, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986)). "Sexual or gender-based conduct which is abusive, humiliating, or threatening violates Title VII, . . . if such hostile conduct pollutes the victim's workplace, making it more difficult for her to do her job, to take pride in her work, and to desire to stay on in her position" *Steiner v. Showboat Operating Co.,* 25 F.3d 1459, 1463 (9th Cir.1994).

To determine whether there is a hostile environment, the court must consider all the circumstances. *Harris,* 510 U.S. at 23, 114 S.Ct. 367. Relevant factors include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating or mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* The Supreme Court explained, "[t]he real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed." *Oncale v. Sundowner Offshore Services, Inc.,* 523 U.S. 75, 81–82, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998)."[C]onduct must be extreme to result in a change in the terms and conditions of employment." *Faragher v. City of Boca Raton,* 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998). "[T]he required showing of severity or seriousness of the harassing conduct varies inversely with the pervasiveness or frequency of the conduct." *Ellison v. Brady,* 924 F.2d 872, 878 (9th Cir.1991). Oregon's antidiscrimination statute, ORS 659A.030, is patterned after Title VII, and Federal law interpreting Title VII is instructive in evaluating claims under the state law. *A.L.P., Inc. v. BOLI,* 161 Or. App. 417, 422, 984 P.2d 883 (1999); *see also Holien v. Sears, Roebuck and Co.,* 298 Or. 76, 88, 689 P.2d 1292 (1984) (applying Title VII elements to state law claim).

*Retaliation*

To state a *prima facie* case of retaliation, the plaintiff must show that: (1) she engaged in a protected activity; (2) the employer subjected her to adverse employment action; and (3) that there is a causal link between her protected activity and the employer's action. *Hashimoto v. Dalton,* 118 F.3d 671, 679 (9th Cir.1997), *cert. denied,* 523 U.S. 1122, 118 S.Ct. 1803, 140 L.Ed.2d 943 (1998). In regard to the second element, the Ninth Circuit has held that "only non-trivial employment actions that would deter reasonable employees from complaining about Title VII violations will constitute actionable retaliation." *Brooks v. City of San Mateo,* 229 F.3d 917, 928 (9th Cir.2000), citing *Ray v. Henderson,* 217 F.3d 1234, 1243 (9th Cir. 2000). Examples of sufficiently adverse employment actions include "termination, dissemination of a negative employment reference, issuance of an undeserved negative performance review and refusal to consider for promotion." *Brooks,* 229 F.3d at 928.

A plaintiff seeking to establish a *prima facie* case of retaliation under ORS 659A.030(1)(f) must establish the same elements as are required under Title VII. *See Harris v. Pameco Corp.,* 170 Or.App. 164, 178–79, 12 P.3d 524 (2000).

## DISCUSSION

*Sexual Harassment*

For purposes of summary judgment, defendant contends that plaintiff has not come forward with sufficient evidence to support the third element of her *prima facie* case—that the conduct was sufficiently severe or pervasive to alter the conditions of plaintiff's employment and create an abusive working environment.

On May 30 or 31, 2002, plaintiff's supervisor told her that instead of taking a second job as a cocktail waitress, she should be a strip dancer because she had a nice body and men would pay to see her dance. On June 3, 2002, while plaintiff and her supervisor were working together on a report, Cios rubbed plaintiff's thigh and said, "that feels nice." The touching lasted thirty seconds to one minute, and then plaintiff moved her leg.

Until this incident, plaintiff admitted that her working relationship with Cios was excellent and the work environment was professional. Plaintiff's boyfriend reported the touching incident to Steve Nestor. Plaintiff assured Mr. Nestor that she could continue to perform her job and work with Cios, and she did not want him fired.

On June 5, 2002, during an interview with Cindy Nestor, plaintiff reported occasional touching by Cios, of her hand, her side, her back, neck massages and an occasion when he hugged her in the staff lounge. Plaintiff also stated, "I would never have mentioned anything if it hadn't been for Lance calling." Hartzell Aff., Ex. 8, p. 5 (plaintiff's written comments to the transcript of her interview with Cindy Nester).

■ These circumstances are not severe or pervasive enough to give rise to a hostile work environment. The conduct of which she complains was not "abusive, humiliating, or threatening" to the extent that it "pollut[ed her] workplace, making it more difficult for her to do her job, to take pride in her work, and to desire to stay on in her position" *Steiner v. Showboat Operating Co.,* 25 F.3d 1459, 1463 (9th Cir. 1994). "The working environment must both subjectively and objectively be perceived as abusive." *Fuller v. City of Oakland,* 47 F.3d 1522, 1527 (9th Cir.1995) (citing *Harris,* 510 U.S. at 21–22, 114 S.Ct. 367). Plaintiff admits that her working relationship with Cios was excellent before June 3, 2002. The only complaint she made about him after June 3, 2002, is that he discussed her allegations against him, and for that he was fired. In these circumstances, it becomes difficult to conclude that a reasonable woman would feel that the terms and conditions of her employment have changed as a result of the misconduct. Cios' conduct is akin to that reported in cases where a hostile work environment was *not* found. *See, e.g., Brooks v. City of San Mateo,* 229 F.3d 917 (9th Cir.2000) (single incident of co-worker touching victim's stomach and breast under her sweater did not rise to the level of actionable harassment). Consequently, defendant is entitled to summary judgment on plaintiff's sexual harassment claim under Title VII. For the same reasons, her state law sexual harassment claim must be dismissed.

Because plaintiff has failed to establish a *prima facie* case of sexual harassment, it is not necessary to reach defendant's affirmative defense.

*Retaliation*

Plaintiff claims that defendant retaliated against her for complaining about sexual harassment by Cios. She claims the following as unlawful retaliation: (1) delay in conducting her annual evaluation; (2) award of a 2%, as opposed to a 3%, pay increase; (3) appointment of Wartella as plaintiff's supervisor; (4) Wartella's written warning and threatening plaintiff's job; (5) Cindy Nester's failure to return plaintiff's voicemail message about Wartella; (6) Carlson's verbal reprimand of August 9, 2002, and two written warnings on August 12, 2002; (7) Baker's taking plaintiff's keys to the director's office; (8) Baker's August 20, 2002, warning to plaintiff about attendance; and (9) Carlson's and Steve Nestor's statements that plaintiff was distracted in the wake of her sexual harassment complaint.

In *Ray v. Henderson,* the Ninth Circuit held that each of the following constituted an adverse employment action: (1) elimination of employee feedback meetings; (2) elimination of a flexible start-time policy; (3) imposition of additional security measures that made it more burdensome for employees to perform their job duties; and (4) reducing the employee's workload disproportionately to the reductions of oth-

er workers, which resulted in disproportionately reduced pay. 217 F.3d 1234, 1243–44 (9th Cir.2000). The *Ray* court concluded that its holding was consistent with the Ninth Circuit's "expansive view of the type of actions that can be considered adverse employment actions" and gave effect to the EEOC's definition that an "adverse employment action" is "any adverse treatment that is likely to deter the charging party or others from engaging in protected activity." *Id.* at 1241, 1242–43.

■ Under the standard enunciated in *Ray,* plaintiff has come forward with sufficient evidence to create an issue of fact whether defendant subjected her to an adverse employment action. Giving plaintiff the benefit of all reasonable inferences, there is an issue of fact whether the alleged circumstances would likely deter a reasonable person from complaining about sexual harassment.

■ Plaintiff must also show that the adverse employment action was caused by her engaging in a protected activity, *i.e.,* complaining about harassment by Cios. The timing and number or adverse employment actions in this case are evidence of causation. Within a few days of Cios' termination, plaintiff received three written memorandums warning her about her job performance over a period of two business days. There is no evidence in the record of a prior written warning issued to plaintiff, though there is evidence of oral counseling. Furthermore, there is evidence that defendant failed to investigate plaintiff's complaints of retaliation: Cindy Nester never returned plaintiff's call of August 9, 2002, and as late as August 22, 2002, Steve Nester maintained that plaintiff had never complained about retaliation despite substantial evidence to the contrary. There is sufficient evidence in the record to create an issue of fact whether defendant's stated reasons for the adverse employment actions are pretextual. Con-sequently, defendant is not entitled to summary judgment on plaintiff's claim of unlawful retaliation under federal and state law.

*Punitive Damages*

■ There is a three-part inquiry to determine whether there is evidence sufficient to allow a punitive damages claim to go to the jury: (1) whether the employer engaged in the discriminatory conduct with malice or reckless indifference to the employee's federally protected rights; (2) whether the conduct may be imputed to the employer; and (3) whether the employer made good faith efforts to comply with Title VII. *Kolstad v. American Dental Assoc.,* 527 U.S. 526, 119 S.Ct. 2118, 144 L.Ed.2d 494 (1999); *Hemmings v. Tidyman's, Inc.,* 285 F.3d 1174, 1197–98 (9th Cir.2002).

■ For the first element, plaintiff must come forward with sufficient evidence to create an issue of fact that the employer acted "in the face of a perceived risk that its actions will violate federal law." *Kolstad,* 527 U.S. at 534–35, 119 S.Ct. 2118. In this case, in regard to retaliation, plaintiff asserted in a memorandum to Steve Nester of August 22, 2002, her belief that she has been retaliated against in violation of state and federal law and listed several incidents that she believed were retaliatory. In response, Steve Nester, by letter of that same date maintained that plaintiff had not complained of retaliation on August 9, 2002, as she claimed—a point which seems moot in light of plaintiff's subsequent documented complaints of retaliation. There is evidence from which a jury could infer that defendant urged plaintiff to move on rather than investigate her complaints of retaliation. At this point in the litigation, there is sufficient evidence to create an issue of fact about defendant's mental state—

whether it engaged in discriminatory conduct, *i.e.*, retaliation, with malice or reckless indifference to plaintiff's federally protected rights.

For the second element, plaintiff must produce sufficient evidence to create an issue of fact whether the conduct may be imputed to defendant. Plaintiff has produced evidence sufficient to create an issue of fact that Carlson, Cindy Nester, and Steve Nester retaliated against her. As officers and shareholders of defendant's parent company, their behavior maybe imputed to defendant.

For the third element, plaintiff must produce sufficient evidence to create an issue of fact that the employer did not make good faith efforts to comply with Title VII. For the same reasons there is an issue of fact in regard to defendant's mental state under the first prong of the inquiry, there are issues of fact in regard to whether defendant tried in good faith to comply with Title VII. Thus, defendant is not entitled to summary judgment on plaintiff's claim for punitive damages.

## CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment (docket No. 26) is granted in part and denied in part. Plaintiff's claim of sexual harassment in violation of state and federal law is dismissed with prejudice. Plaintiff's claim of retaliation in violation of state and federal law and her claim for punitive damages remain.