Karen DE LA TORRE,
et ux., Plaintiffs,

v.

MERCK ENTERPRISES, INC.,
et al., Defendants.

No. CV–05–3987–PHX–ROS.

United States District Court,
D. Arizona.

March 31, 2008.

Steven Gary Sandoval, Sandoval & St. Clair PLC, Tucson, AZ, for Plaintiffs.

Donald Peder Johnsen, Gallagher & Kennedy PA, Phoenix, AZ, Joel H. Kaplan, Seyfarth Shaw LLP, Chicago, IL, Robert J. Carty, Jr., Timothy M. Watson, Seyfarth Shaw LLP, Houston, TX, for Defendants.

## ORDER

ROSLYN O. SILVER, District Judge.

Before the Court is Defendants' Motion for Summary Judgment (Doc. 125) and Motion to Strike (Doc. 137). For the reasons below, the Court will grant Defendants' Motion for Summary Judgment and grant in part and deny in part Defendants' Motion to Strike.

## BACKGROUND

The following facts are uncontroverted or presented in a light most favorable to Plaintiff.[1] Defendant Merck Enterprises, Inc. ("Merck") markets health products to hospitals, doctors, and pharmacies in the United States. (Defs.' SOF ¶ 1.) Plaintiff Karen Da La Torre is 54–year–old woman who began working for Merck in 1980 as a professional representative delivering product information to hospitals, doctors, and pharmacies. (*Id.* ¶¶ 1, 2.) As a professional representative, Plaintiff did not maintain an office at Merck and worked from home. (*Id.* ¶ 3.) Merck is a subscriber under the Arizona Workers' Compensation Act. (*Id.* ¶ 7.)

Defendant Steve Hildebrand supervised Plaintiff from 1988 to 1990 and from 1996 until March 2004. (*Id.* ¶ 8.) Plaintiff interacted with Hildebrand during field visits which occurred once or twice a month and during business meetings that occurred once a month. (*Id.* ¶ 10.) Her interaction with Hildebrand ceased almost entirely when she began reporting to Lynne Kanatas in March 2004. (*Id.* ¶ 11.) In her performance reviews for 1996, 1998, and 2000, she wrote favorable comments about Hildebrand. (*Id.* ¶ 12.) Hildebrand recommended Plaintiff for promotion from Senior Representative to Executive Professional Representative in 1997 and consistently reported favorable performance ratings for Plaintiff. (*Id.* ¶¶ 12–14.) Hildebrand's immediate supervisor, Defendant Phillip Vaughn, approved all the merit raises and discretionary awards Hildebrand recommended from 1998 to 2004, awarded Plaintiff stock options in 2001,

---

1. The reasons for relying on these facts are set forth in Section I.

and approved an "Award of Excellence" to Plaintiff in 2004. Plaintiff was one of the top producers at Merck and she described her own job performance as "a 10 out of 10." (*Id.* ¶ 18; Pl.'s SOF ¶ 14.)

Over the years, the use and analysis of computer-related data at Merck became increasingly important. (Defs.' SOF ¶¶ 19–20.) From 2000 to 2005, Plaintiff listed "computer skills" as an area for development in her annual Employee Development Plans. (*Id.* ¶¶ 22–23.) Plaintiff's performance evaluations in 2001, 2002, and 2003 also noted the need for her to improve her computer skills. (*Id.* ¶ 25.) When Kanatas became Plaintiff's supervisor in 2004, she "developed concerns about [Plaintiff's] ability to use" Merck's computer-based business-analysis tools. (*Id.* ¶ 26.) Plaintiff told Kanatas that "she wanted to learn how to use all the sales tools and to learn finally how to type as it was something she could not do. She said in the past that she has relied on her teammates or her previous manager to either type or create the documents she needed to manage her business." (*Id.*) Plaintiff did not attend training which was offered to develop her computer skills. (*Id.* ¶ 21.) However, Plaintiff's lack of computer skills did not prevent Plaintiff from being one the top selling performers at Merck. (Pl.'s SOF ¶¶ 22–23.)

In March 2004, Plaintiff learned that she was not promoted from Executive Professional Representative to Senior Executive Professional Representative, but that two younger females in her district were selected. (Defs.' SOF ¶ 29.) A promotion to Senior Executive Professional Representative is reserved for representatives who have developed a consistent record of successful sales figures and a high level of competence. (*Id.* ¶ 30.) In 2002 and 2003, Plaintiff's sales results fell below her objectives. (*Id.* ¶ 30.) The two females who received the promotions to Senior Executive Professional Representative had better sales numbers than Plaintiff. (*Id.* ¶ 32.)

In September 2004, Defendant Connie Cason, an Osteoporosis Specialty Manager, posted an opening for an Osteoporosis Specialty position. (*Id.* ¶¶ 35, 39.) Computer skills are particularly important for Osteoporosis Specialty representatives. In addition, the specialty position was previously filled by the district's "computer champion"[2]—an employee who had substantial expertise using computers and who helped other representatives troubleshoot computer-related problems. (*Id.* ¶ 37.) Consequently, it was important to Cason that the person selected to fill the specialty position have significant proficiency with Merck's computerized business-analysis tools. (*Id.* ¶ 38.)

Based on their resumes, two candidates seemed most qualified for the position: Plaintiff and Darryl Blake. (*Id.* ¶ 40.) Prior to interviewing the candidates, Cason preferred Plaintiff because she had been with Merck longer. (*Id.*) Before the interview, Kanatas called Cason to discuss the candidates skills. (*Id.* ¶ 41.) Kanatas was surprised to learn that Cason was probably going to select Plaintiff because she believed that Blake was better prepared for the job since he had computer-related skills which Plaintiff lacked. (*Id.* ¶ 42.) Cason was part of a three person panel[3] that interviewed Plaintiff, Black, and a third candidate, Arti Short, on September 16, 2004. (*Id.* ¶¶ 41, 44.) At the interview, Plaintiff brought a sheet listing

---

2. Cason gave this title based upon the employee's computer skills; there was no competition for this title. (Pl.'s SOF ¶¶ 37–38.)

3. The other two people on the panel, Jack Sandner and Mark Bowler, are not Defendants in this case. (*Cf.* Defs.' SOF ¶ 44 *with* Amend. Compl.)

her historical sales figures. (*Id.* ¶ 45.) During the interview, Plaintiff also volunteered that one of her development areas was her lack of computer skills. (*Id.*) Blake brought a book containing, among other things, examples of business analyses he had prepared using Merck's computerized business-analysis tools. (*Id.* ¶ 47.) By the end of the interviews, Cason viewed both Plaintiff and Black as equal in most skills, except that Blake demonstrated greater proficiency with computers. (*Id.* ¶ 48.) Cason declared that, after the interview, she and her fellow interviewers reached a consensus that Blake was the best-qualified candidate. (*Id.* ¶ 49.) Cason selected "motivational fit" as the reason for not hiring Plaintiff on a form, and some unidentified person from Merck told Cason that she had not selected the right reason.[4] (Pl.'s SOF ¶ 40–43.)

That same day, Cason informed her supervisor, Defendant Dan Schwarz, about the consensus of the interviewers that Blake was the best-qualified candidate. (*Id.* ¶¶ 50–51.) Schwarz was also aware that Plaintiff had received a serious policy violation in January 2003 and that Blake did not have any policy violations.[5] (*Id.* ¶ 51.) Based upon Plaintiff's lack of computer skills and Plaintiff's prior policy violation, Schwarz ratified Cason's decision to select Blake. Cason did not discuss her decision with anyone other than her fellow interviewers, Kanatas, and Schwarz; and Schwarz did not discuss his decision with anyone other than Cason. (*Id.* ¶ 54.)

After the interview and before she was informed of who was selected, Plaintiff spoke with Vaughn, Black, and Short, and Hildebrand approached her. Without saying a word, he began to "massage" her shoulders. (Defs.' SOF ¶¶ 56, 64, 68.)

Hildebrand placed both hands on the middle area of her shoulders and began kneading her muscles. (*Id.*) When he did this, Plaintiff "flinched," "pull[ed] the shoulders down," and "twist[ed] away." (*Id.*) This massage could have lasted for as long as one minute. (*Id.*) Plaintiff left the room visually upset and offended and reported the incident to Kanatas the next day, September 17, 2004. (Pl.'s SOF ¶ 56–59.)

Kanatas asked Plaintiff how she wanted her complaint to be handled, and Plaintiff said that she wanted Vaughn to talk with Hildebrand. (Defs.' SOF ¶ 58.) Vaughn asked Kanatas whether Plaintiff wanted to make a claim of sexual harassment, and Plaintiff said she did not. (*Id.*) Vaughn immediately called Hildebrand and counseled him about the situation, including that casual touching in the workplace may be construed differently by different employees, instructed him to report to Vaughn's office for a further face-to-face counseling session, and called and reported what occurred to Kanatas. (*Id.* ¶ 59.) Twenty minutes later, Kanatas called Plaintiff back to let her know that Hildebrand had been counseled by Vaughn and asked Plaintiff "if there [were] any other actions she wanted to take, and [Plaintiff] said 'no.'" (*Id.* ¶ 59.) Hildebrand had never done this to Plaintiff before and she had never complained before this incident. (*Id.* ¶ 57.) Vaughn did not report this incident to Human Resources. (Pl.'s SOF ¶¶ 60–62.) Neither Kanatas, Vaughn, nor Hildebrand told anyone else about Plaintiff's complaint. (*Id.* ¶ 62.)

Plaintiff was notified of Cason's decision on September 20, 2004. (Pl.'s SOF ¶ 54.) Ten days later, on September 30th, Plain-

---

4. Plaintiff did not provide and/or cite to this form; it was referenced in Cason's deposition. (Cason Dep. 66:19–68:16, Mar. 7, 2007.)

5. The record does not disclose the nature of this "serious policy violation."

tiff sent an e-mail to Kanatas and copied two human resources professionals again complaining about the massage incident, describing it as "an incident of sexual harassment." (Defs.' SOF ¶¶ 63, 65.) Plaintiff also said that she could "only speculate that perhaps [her] actions of reporting an incident of sexual harassment resulted in [her] being denied a position for which [she] was highly qualified." (*Id.* ¶ 65.) Human resources followed up with Kanatas and Plaintiff several times and spoke with the witnesses, Vaughn, Blake, and Short. These witnesses all said that, in their view, they had not witnessed anything inappropriate and human resources concluded that no sexual harassment had occurred. (*Id.* ¶ 67.) Hildebrand was never disciplined for this event, and Plaintiff was not satisfied with the response of Vaughn because the incident was not reported to human resources. (Pl.'s SOF ¶¶ 60–65.) After complaining about the massage, Plaintiff made no further complaints to management about Hildebrand. (*Id.* ¶ 77.)

Plaintiff has described Hildebrand as an "equal opportunity" offender because he makes offensive statements to both men and women alike. (Defs.' SOF ¶ 72.) On several occasions during the summers of 1989 and 1990, Hildebrand would tell Plaintiff that another female representative would aim the air conditioning vents in her car between her legs. (*Id.* ¶ 71(p).)

In January 2005, Plaintiff took short-term disability leave for roughly eight months due to "overwhelming" anxiety and "disappointment in her Company." (*Id.* ¶ 77.) While on leave, on February 23, 2005, Plaintiff filed her first EEOC Charge of Discrimination, alleging that she had been denied the promotion to Senior Executive Professional Representative on account of her age and sex, that Hildebrand

sexually harassed her by rubbing her shoulder and by making sexual remarks to her,[6] and that she was denied promotion to Osteoporosis Speciality Representative because she reported the shoulder-rubbing incident. (*Id.* ¶¶ 79–80.)

Plaintiff returned to work on August 22, 2005 and met with Vaughn. (*Id.* ¶ 85.) Vaughn told Plaintiff that he understood she was still pursuing her claim, but asked her not to discuss the matter on the job. (*Id.*) Plaintiff informed Vaughn that she wanted to interview for the position of Vaccine Specialty representative, which Vaughn approved. (*Id.* ¶ 86.) Plaintiff filed this lawsuit on September 1, 2005. (*Id.* ¶ 88.)

On October 6, 2005, Plaintiff interviewed for a Vaccine Specialty position along with other candidates. (*Id.* ¶ 89.) The recipient of this position was to report to the hiring manager, but the hiring manager position was vacant at the time Plaintiff interviewed. (*Id.* ¶¶ 89–90.) Joe Nowak, who lived in Pennsylvania at the time, was hired as manager a month after Plaintiff interviewed. (*Id.* ¶ 90.) When Nowak took the position, he saw that his district had three Vaccine Specialty vacancies (West Phoenix, East Phoenix, and Tucson) and learned that a number of candidates had interviewed for these positions before he became manager. (*Id.* ¶ 91.) He asked human resources about the status of the interviews and learned that only two candidates—Plaintiff and Elsa Paradies—had been deemed acceptable candidates based on their performance reviews. (*Id.*) About two weeks after Nowak took the position, he decided to interview additional candidates to fill the three vacancies and ultimately interviewed 24 additional candidates. (*Id.* ¶ 92.) Nowak did not re-interview Plaintiff or Para-

---

6. Plaintiff has not cited to any portion of the record to show when Hildebrand made the

alleged sexual remarks and what specifically Hildebrand allegedly said.

dies because, if he did so, he would have had to re-interview all the candidates who had already interviewed. (*Id.* ¶ 93.) Instead, Nowak obtained information about Plaintiff and Paradies from their managers. (*Id.*) Plaintiff's manager at the time was Maria Kockinis. (*Id.*)

It was very important to Nowak that his representatives embrace and utilize a new sales model known as Customer Quality Selling ("CQS"). (*Id.* ¶ 94.) Nowak had concerns about Plaintiff's ability to embrace CQS and to be an effective team member because, when he worked as Plaintiff's peer in 1999 to 2001, he observed her scoff at a new sales model and ridicule a trainer in front of her peers in a training session. (*Id.* ¶ 95.) In addition, when Nowak discussed Plaintiff's qualifications with her manager, Kockinis informed Nowak that Plaintiff did not follow CQS, but had her own way of detailing health care providers. (*Id.* ¶ 96.)

In November and December of 2005, Nowak selected two candidates for the two Phoenix-based positions: Katie Hopkins and Rich Rud. (*Id.* ¶ 98.) Hopkins and Rud had demonstrated their capacity to embrace management directives, such as CQS. (*Id.* ¶ 100.) Nowak declared that he selected Hopkins and Rud because he deemed them more qualified than Plaintiff, particularly given her failure to embrace new selling models such as CQS. (*Id.*) Nowak did not learn that Plaintiff had made a harassment or discrimination complaint until after he moved to Phoenix in March 2006—four months after he decided to hire Hopkins and Rud. (*Id.* ¶ 102.) Kockinis did not tell Nowak about Plaintiff's claims

against Merck, and Nowak did not have any conversations with or influence from Cason, Hildebrand, Vaughn, or Schwarz in making his decision. (*Id.* ¶¶ 97, 101.) On January 13, 2006, Plaintiff filed her second Charge of Discrimination alleging she was denied the Vaccines Specialty position in retaliation for filing her first Charge of Discrimination. (*Id.* ¶ 105.)

In February 2006, Vaughn received reports that Plaintiff was openly discussing her lawsuit with other Merck representatives and potentially with health care providers. (*Id.* ¶ 108.) Vaughn scheduled a meeting with Plaintiff for February 22, 2006 to speak with her about appropriate communications with customers. (*Id.* ¶ 109.) Plaintiff eventually decided not to attend this meeting and delivered a resignation letter dated February 21, 2006, explaining that her "work situation [was] untenable," and she felt she had been constructively discharged. (*Id.* ¶ 110.) Plaintiff filed a Second Amended Complaint on October 31, 2006. Plaintiff brings claims for sexual harassment, sex and age discrimination, retaliation, negligence, intentional infliction of emotional distress, and constructive discharge.

## ANALYSIS

### I. Motion to Strike

Merck has filed specific objections to much of the evidence offered by Plaintiff, including objections based on foundation, relevance, hearsay, and authentication.[7] Plaintiff responded by summarily stating that "[m]atters set forth in Plaintiffs'

---

7. Plaintiffs claim that the Court should deny Defendants' motion to strike because it is 65 pages in length, citing Local Rules of Civil Procedure ("Local Rule(s)") 7.2(e) ("a motion including its supporting memorandum ... shall not exceed seventeen (17) pages, exclusive of attachments and any required statement of facts"). However, the Local Rules impose no page limit concerning the filing of or objections to a party's statement of facts. *See* Local Rule 56.1. The Court will construe "Defendants' Objections to and Motion to Strike Certain of Plaintiffs' Controverting Statement of facts" (Doc. 137) as an objection to the admission of evidence as it would at trial.

Statement of Facts are material and admissible," citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), for the proposition that a nonmoving party need not "produce evidence in a form that would be admissible at trial in order to avoid summary judgment."

■ "A trial court can only consider admissible evidence in ruling on a motion for summary judgment." *Orr v. Bank of America, NT & SA,* 285 F.3d 764, 773 (9th Cir.2002); *see also* Fed.R.Civ.P. 56(e)(1) ("A supporting or opposing affidavit must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated."). Federal Rule of Evidence 602 prohibits a witness from testifying on a matter "unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." Rule 602 is considered in conjunction with Rule 701, which limits opinions of non-experts to opinions rationally based on the perceptions of the witness. *See Weinstein's Evidence Manual* § 10.03 (2007). Thus, a witness has personal knowledge only when testifying about events perceived through the physical senses or when testifying about opinions rationally based on personal observation and experience. *See id.* "[C]onclusory affidavits fail to establish foundation." *Travelers Cas. & Sur. Co. of Am. v. Telstar Const. Co.,* 252 F.Supp.2d 917, 924 (D.Ariz.2003). The Ninth Circuit has also "repeatedly held that unauthenticated documents cannot be considered in a motion for summary judgment." *Orr,* 285 F.3d at 773.

■ While a nonmoving party need not present evidence in an admissible *form,* "the *facts* underlying the [evidence] must be of a type that would be admissible as evidence." *Hughes v. United States,* 953 F.2d 531, 543 (9th Cir.1992) (emphasis added). Further, proper foundation must be laid regardless of the source of evidence. *See Carmen v. San Francisco Unified Sch. Dist.,* 237 F.3d 1026, 1028 (9th Cir.2001) ("A plaintiff's belief ... without evidence supporting that belief, is no more than speculation or unfounded accusation.... [Plaintiff] failed to show *personal knowledge.* It is not enough for a witness to tell all she knows; she must know all she tells.") (emphasis added). For example, in *Fraser v. Goodale,* 342 F.3d 1032, 1036–1037 (9th Cir.2003), the court held that the contents of a diary could be considered in a summary judgment proceeding, regardless of whether the diary was hearsay, when the author of the diary relied upon it during her deposition and could testify to all relevant portions of the diary from personal knowledge—meaning that her testimony was based on her physical senses or opinions rationally based on personal observation or experience. *See* Fed.R.Evid. 602, 701.

■ Thus, though Plaintiff is not required to produce evidence in a form that would be admissible at trial, she must show that she would be able to present the underlying facts in an admissible manner at trial. But, Plaintiff only stated in a conclusory manner that her evidence is admissible citing *Celotex,* and completely failed to respond to or remedy any of the specific defects identified by Merck. Local Rule 7.2(c) requires an opposing party to file a responsive memorandum. "If a motion does not conform in all substantial respects with the requirements of [Local Rule 7.2], ... such non-compliance may be deemed consent to the denial or granting of the motion and the Court may dispose of the motion summarily." Plaintiff's failure to offer any specific arguments concerning the defects identified by Merck is a failure to conform in all substantial re-

spects with Local Rule 7.2(c). The Court will not speculate or anticipate how Plaintiff might attempt to overcome the objections raised by Merck.[8]

Based upon the Court's review of the record and the objections made by Defendants, the Court will not consider the following evidence:

| EVIDENCE STRICKEN | REASON |
| --- | --- |
| De La Torre Aff. ¶ 3, Pl.'s SOF ¶ 3 | Foundation |
| Pl.'s SOF ¶ 4 | Foundation |
| Pl.'s SOF ¶ 5 | Unsupported |
| Pl.'s SOF ¶ 6 | Foundation |
| De La Torre Aff. ¶ 5, Pl.'s SOF ¶ 7 | Foundation, Improper Legal Argument |
| De La Torre Aff. ¶ 6 (2d sent.), Pl.'s SOF ¶ 8 | Foundation |
| De La Torre Aff. ¶ 7, Pl.'s SOF ¶ 9 | Foundation |
| Pl.'s SOF ¶ 10 | Foundation |
| Pl.'s SOF ¶ 11 (2d sent.), Pl.'s Ex. 10 | Foundation, Authentication, Hearsay |
| Pl.'s SOF ¶ 12 | Foundation |
| De La Torre Aff. ¶ 12, Pl.'s SOF ¶ 14 (2d sent.) | Foundation, Unsupported |
| De La Torre Aff. ¶ 13, Pl.'s SOF ¶ 16 | Foundation |
| Pl.'s SOF ¶ 17; Pl.'s Ex. 12 | Foundation; Hearsay |
| Pl.'s SOF ¶ 18 (2d & 3d sent.) | Foundation |
| Pl.'s SOF ¶ 19 (2d & 3d sent.); De La Torre Aff. ¶ 15 (2d & 3d sent.); Pl.'s Ex. 3 | Foundation, Authentication |
| Pl.'s SOF ¶ 20, Pl.'s Ex. 9 | Unsupported, Hearsay, Authentication |
| Pl.'s SOF ¶ 21 (statement that "Plaintiff was as [sic] outstanding performer in sales at all times") | Foundation, Authentication |
| Pl.'s SOF ¶¶ 22–23 (1st, 2d, 3d sent., and statements re "only female") | Foundation, Relevance |
| Pl.'s SOF ¶¶ 24–28 | Foundation, Evidence stricken above |
| Pl.'s SOF ¶¶ 30–32; De La Torre Aff. ¶¶ 7, 12, and 14) | Foundation |
| Pl.'s SOF ¶¶ 33–34, De La Torre Aff. ¶¶ 17, 18 | Foundation |
| Pl.'s SOF ¶ 36 | Foundation, Evidence stricken above |
| Pl.'s SOF ¶¶ 37–38 (1st, 3d, 5th, and 6th sent.) | Unsupported, Relevance |
| Pl.'s SOF ¶¶ 40–43 (1st, 2d, 3d, 6th sent.) | Foundation, Evidence stricken above |
| Pl.'s SOF ¶¶ 45–46 | Foundation, Unsupported, Relevance |
| Pl.'s SOF ¶¶ 47–49 | Unsupported, Evidence stricken above |
| Pl.'s SOF ¶¶ 50–54 (except last sentence), Pl.'s Ex. 7 | Unsupported, Foundation, Hearsay |
| Pl.'s SOF ¶¶ 55 | Foundation, Hearsay |
| Pl.'s SOF ¶¶ 56–59 (1st and 5th sent.) and corresponding allegations in De La Torre Aff. ¶¶ 20–21 | Foundation |

**8.** Although Plaintiff filed initial disclosures under Fed.R.Civ.P. 26(a)(1), Plaintiff did not file pretrial disclosures under Fed.R.Civ.P. 26(a)(3). Nevertheless, the Court finds Plaintiff's failure is harmless under the circumstances. *See* Fed.R.Civ.P. 37(c)(1). However, Plaintiff's counsel should know and is required to know that initial disclosures are not the same as pretrial disclosures. *Cf.* Fed.R.Civ.P. 26(a)(1) with 26(a)(3).

| | |
|---|---|
| Pl.'s SOF ¶¶ 60–62 (to the extent that it implies that Vaughn was aware of prior allegations) | Hearsay, Evidence stricken above |
| Pl.'s SOF ¶¶ 63–65 (to the extent that it implies that De La Torre made complaints about Hildebrand before 9/17/04 or that Vaughn was aware of any other allegations of sexual harassment) | Sham Affidavit, Foundation, Evidence stricken above |
| Pl.'s SOF ¶¶ 66–70 | Foundation, Evidence stricken above |
| Pl.'s SOF ¶¶ 71–72 | Hearsay, Evidence stricken above, Foundation, Relevance, Argumentative |
| The allegations incorporated by Plaintiff in the following paragraphs corresponding with Defendants' SOF ¶ 71, will not be considered: | |
| (a)-(c) | Relevance (no evidence that unwelcome) |
| (d)-(e) | Hearsay, Relevance |
| (f) | Hearsay, Evidence stricken above |
| (g) | Hearsay, Foundation |
| (h)-(j) | Hearsay, Relevance |
| (k)-(m) | Relevance |
| (n) | Hearsay, Relevance |
| (o) | Relevance, Foundation |
| (q)-(r) | Relevance |
| Pl.'s SOF ¶¶ 73–76, De La Torre Aff. ¶ 24, 25 | Foundation, Relevance, Evidence stricken above |
| Pl.'s SOF ¶¶ 77–81 | Foundation |
| Pl.'s Ex. 13, Pl.'s SOF ¶¶ 82–87 (paragraph 1) | Hearsay, Relevance (Plaintiffs have never alleged any claim arising out of her non-promotion); Privilege (Merck did provide briefing on this issue in a timely manner in its objections; Plaintiffs' failed to respond substantively) |
| Pl.'s SOF ¶¶ 82–87 (paragraph 2) | Unsupported |
| Pl.'s SOF ¶¶ 88 (2d sent.) | Argumentative |
| Pl.'s SOF ¶¶ 89–93, Pl.'s Ex. 8, De La Torre Aff. ¶ 26 (2d and 4th sent.) | Relevance, Hearsay, Unsupported, Conclusory |
| Pl.'s SOF ¶¶ 94–96 | Unsupported, Foundation |
| Pl.'s SOF ¶¶ 97–104 | Unsupported, Foundation, Evidence stricken above |
| Pl.'s SOF ¶¶ 107–110 | Evidence stricken above, Foundation, Unsupported, Relevance |
| Pl.'s SOF ¶¶ 111–113 | Argumentative, Unsupported, Foundation |

In addition, although Plaintiff purports to contest nearly all Defendants' Statement of Facts, Plaintiff's objections were nonresponsive and/or did not raise a genuine issue of material fact. As a consequence, all paragraphs of Defendants Statement of Facts are deemed admitted.[9]

9. In Plaintiff's objection to Defendants' Motion for Summary Judgment, if it cites to facts at all, it points to portions of attached documents, not to paragraphs of her statement of facts. This violates Local Rule 56.1(e): "Memoranda of law filed in support of or in opposition to a motion for summary judgment, including reply memoranda, shall include citations to the specific paragraph in the statement of facts that supports factual assertions made in the memoranda." The Court will only consider facts set forth in Plaintiff's and Defendants' Statements of Fact.

## II. Summary Judgment Standard

A court must grant summary judgment if the pleadings and supporting documents, viewed in the light most favorable to the non-moving party, "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Substantive law determines which facts are material, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In addition, the dispute must be genuine, that is, "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

Furthermore, the party opposing summary judgment "may not rest upon the mere allegations or denials of [the party's] pleading, but ... must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). There is no issue for trial unless there is sufficient evidence favoring the non-moving party; "[i] f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson,* 477 U.S. at 249–50, 106 S.Ct. 2505 (citations omitted). However, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Id.* at 255, 106 S.Ct. 2505. Therefore, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [its] favor" at the summary judgment stage. *Id.* Finally, Rule 56(e) con-templates the result of a party's failure to respond adequately to a motion for summary judgment. If the non-moving party does not respond by setting forth specific facts showing there is a genuine issue for trial, "summary judgment, if appropriate, shall be entered against the [non-moving] party." Fed.R.Civ.P. 56(e).

## III. Sexual Harassment Claims

■ Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... sex." 42 U.S.C.A. § 2000e–2(a)(1). Title VII's prohibition "is not limited to 'economic' or 'tangible' discrimination," but includes sexual harassment that is so "severe or pervasive" as to "alter the conditions of [the victim's] employment and create an abusive working environment." *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986) (internal quotation marks and citations omitted).

■ The Ninth Circuit recently summarized the principles governing employer liability for sexual harassment claims involving the harassment of an employee by her direct supervisor. *Craig v. M & O Agencies, Inc.,* 496 F.3d 1047, 1054 (9th Cir.2007) (citing *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998), and *Faragher v. City of Boca Raton,* 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998)).

> The [Supreme] Court divided cases in which a supervisor harassed a subordinate into two categories. The first category involves situations where "a supervisor exercising his authority to make critical employment decisions on behalf of his employer takes a sufficient-

ly concrete action with respect to an employee." In these situations, termed "tangible employment action" or "quid-pro-quo" harassment, the employer may be held vicariously liable under traditional agency law. In the second category, which are known as "hostile environment" claims, the Court tempered the agency principles by allowing the employer to assert an affirmative defense if the employer "is able to establish that it acted reasonably and that its [ ] employee acted unreasonably."

*Craig*, 496 F.3d at 1054 (citations omitted). Plaintiff bases her sexual harassment claim on both quid pro quo and hostile work environment theories.[10]

## A. Quid Pro Quo Theory

■■■ To prove actionable harassment under a quid pro quo or "tangible employment action" theory, Plaintiff must show that Hildebrand " 'explicitly or implicitly condition[ed] a job, a job benefit, or the absence of a job detriment, upon an employee's acceptance of sexual conduct.' " *Id.* (quoting *Nichols v. Frank*, 42 F.3d 503, 511 (9th Cir.1994)).When the request for sexual favors and the conditioning of benefits is implicit, rather than explicit, a plaintiff must show that the supervisor's words or conduct would communicate to a reasonable woman in the employee's position that sexual favors were requested and that such participation is a condition of employ-

ment. *See Holly D. v. Cal. Inst. of Tech.*, 339 F.3d 1158, 1173–74 (9th Cir.2003). A plaintiff may not rest on "unsubstantiated assertions" which describe a supervisor's behavior in a "vague and [ ] general manner" to show that the request for sexual favors or the conditioning of benefits is implicit. *See id.* at 1176. If a plaintiff succeeds in showing harassment under a tangible employment action, "the employer is strictly liable for the supervisor's conduct." *Craig*, 496 F.3d at 1054.

■■■ Plaintiff alleges that "Plaintiff and the other female employees that did not allow Defendant Hildebrand to sexually harass them were discriminated against based upon their sex and the terms and conditions of their employment were altered due to failure to participate with him." (Pl.'s Obj. to MSJ at 14.) Although a failure to promote is a tangible employment action, *Ellerth*, 524 U.S. at 761, 118 S.Ct. 2257, Plaintiff has offered no evidence that Hildebrand expressly requested, or conditioned promotion or other conditions of employment on the provision of, sexual favors from Plaintiff or any other female Merck employee. Further, Plaintiff has generally alleged that Hildebrand made "unwanted sexual remarks to Plaintiff." (Am. Compl. ¶ 11.) However, this "vague and unsupported allegation" is insufficient to overcome summary judgment. *Craig*, 496 F.3d at 1054; *Holly D.*, 339

10. Plaintiff's claims are not viable to the extent they assert claims against the individual Defendants under Title VII, the Age Discrimination in Employment Act, or the Arizona Civil Rights Act ("ACRA") because individual Defendants cannot be held liable for damages under these laws. *See Miller v. Maxwell's Intern. Inc.*, 991 F.2d 583, 587–588 (9th Cir. 1993) (Title VII and Age Discrimination in Employment Act); *Ransom v. Arizona Bd. of Regents*, 983 F.Supp. 895, 904 (D.Ariz.1997) (ACRA). In addition, Plaintiff brings her harassment, discrimination, and retaliation claims under both Title II and the ACRA. But,

Arizona courts have held that the Arizona Civil Rights Act is "generally identical" to Title VII, and that Title VII case law is instructive in determining a violation of Arizona Civil Rights ACRA. *Bodett v. CoxCom, Inc.*, 366 F.3d 736, 742 (9th Cir.2004)(citing *Higdon v. Evergreen Int'l Airlines, Inc.*, 138 Ariz. 163, 673 P.2d 907 (1983)). Plaintiff has not argued that the result would be different under Title VII than it would be under the ACRA. Therefore, the Court will analyze Plaintiff's harassment, discrimination, and retaliation claims under federal law.

F.3d at 1176. No reasonable jury could find that Hildebrand's shoulder massage, without more,[11] would communicate to a reasonable woman in Plaintiff's position that sexual favors were requested and that such participation was a condition of promotion. *See Holly D.*, 339 F.3d at 1175–76 (dismissing sexual harassment claim under quid pro quo theory, even though supervisor and employee engaged in sexual relations and the employee's performance reviews improved thereafter, because there was no evidence connecting any discussion of her job duties with the requests for the employee to engage in sexual acts). In addition, Plaintiff has provided no evidence that Hildebrand engaged in any unwelcomed sexual conduct with any other female employee. Thus, Plaintiff's quid pro quo theory of sexual harassment must fail as a matter of law.

### B. Hostile Work Environment Theory

 To establish a prima facie hostile work environment claim under Title VII, an employee must show that: "(1) she was subjected to verbal or physical conduct of a sexual nature, (2) this conduct was unwelcome, and (3) the conduct was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Craig*, 496 F.3d at 1055. "[A] sexually objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998). "[W]hether an environment is sufficiently hostile or abusive" is determined by " 'looking at all the circumstances,' " including the " 'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.' " *Faragher*, 524 U.S. at 787–88, 118 S.Ct. 2275 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21–22, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)). In order "to ensure that Title VII does not become a general civility code, ... conduct must be extreme to amount to a change in the terms and conditions of employment." *Id.* at 788, 118 S.Ct. 2275 (citations and internal quotations omitted). "[T]he required showing of severity or seriousness of the harassing conduct varies inversely with the pervasiveness or frequency of the conduct." *Brooks v. City of San Mateo*, 229 F.3d 917, 926 (9th Cir.2000) (quoting *Ellison v. Brady*, 924 F.2d 872, 878 (9th Cir. 1991)). "If a single incident can ever suffice to support a hostile work environment claim, the incident must be extremely severe." *Brooks*, 229 F.3d at 926.

 Even assuming that the first two elements are met,[12] Plaintiff has failed to establish a prima facia case of sexual harassment under a hostile work environment theory. The alleged conduct was infrequent. Again, the only admissible evidence that Plaintiff has to support her hostile work environment theory is the massage incident in 2004 and the story that Hildebrand told Plaintiff about another female representative who would aim the air conditioning vents between her legs during the summers of 1989 and 1990. However, an unwelcomed, one minute

---

11. Plaintiff concedes that Hildebrand did not say anything to her while massaging her shoulder. (D's SOF ¶ 68.)

12. As described in this case, it is questionable whether the shoulder massage is conduct of a sexual nature. Significantly, Plaintiff did not express disturbed sensibilities when demonstrating Hildebrand's massage on her counsel. (Defs.' SOF ¶ 74.)

shoulder massage with other people in the room, coupled with a story about another employee nearly 15 years earlier, does not conceivably rise to the level of severity required to constitute sexual harassment. Finally, there is no evidence that Hildebrand subjected Plaintiff (or any other employee) to other unwelcomed sexual conduct, and Plaintiff has offered no evidence to support her allegation that those who participate in Hildebrand's "sexual games" are treated more favorably. (*See* Obj. to Defs.' MSJ at 8.)

There is also no objective evidence that the shoulder rub was physically threatening or humiliating. In fact, the witnesses who were present during the shoulder massage stated that they did not witness anything inappropriate. Plaintiff did offer evidence that the shoulder massage subjectively interfered with her working conditions, i.e., she took an eight month disability leave due in part to "disappointment in her Company." However, Plaintiff has failed to offer evidence that this single incident unreasonably interfered with the conditions of her employment. Hildebrand was not Plaintiff's supervisor at the time of the shoulder massage, Hildebrand had little to no interaction with Plaintiff after the incident, and, by her own account, Plaintiff was an excellent employee. *See Brooks*, 229 F.3d at 922–26 (no unreasonable interference, even though co-worker fondled plaintiff's bare breast and plaintiff began seeing a psychologist and took a six-month leave of absence, when it was an isolated incident).

Based upon all the circumstances, Plaintiff falls short of proving the extreme conduct required to amount to a change in the terms and conditions of her employment.

## IV. Discrimination Claims

Plaintiff claims that Merck failed to promote her to Senior Executive Representative, Osteoporosis Specialty Representative, and Vaccine Specialty Representative because of her sex and/or age. The proper legal framework for determining whether Plaintiff's discrimination claim should survive summary judgment is the burden shifting scheme. Plaintiff must establish a prima facie case of discrimination; if Plaintiff succeeds in establishing a prima facie case, the burden of production shifts to Defendants to articulate a legitimate, nondiscriminatory reason for not promoting Plaintiff; and if Merck does so, Plaintiff must demonstrate that Defendants' articulated reason is a pretext for unlawful discrimination by "either directly persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *See Aragon v. Republic Silver State Disposal Inc.*, 292 F.3d 654, 658–659 (9th Cir.2002) (citations and internal quotations omitted). To establish a prima facie case, Plaintiff must show (1) she belongs to a protected class, (2) she was qualified for the position, (3) she was subject to an adverse employment action, and (4) similarly situated persons outside the protected class were treated more favorably. *Id.* at 658.

### A. Senior Executive Position

 Plaintiff cannot bring a claim for discrimination for non-promotion to the senior executive position because it is time-barred. When an employee files a charge of an unlawful employment practice with a state agency, "the employee must file a charge with the Equal Employment Opportunity Commission ("EEOC") within 300 days of the alleged unlawful employment practice in order to preserve the claim for a subsequent civil action under 42 U.S.C. § 2000e–5(e)(1)." *Porter v. Cal. Dep't of Corr.*, 419 F.3d 885, 891 (9th Cir. 2005). The Supreme Court has explained:

[D]iscrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges. Each discrete discriminatory act starts a new clock for filing charges alleging that act. The charge, therefore, must be filed within the 180– or 300–day time period after the discrete discriminatory act occurred. The existence of past acts and the employee's prior knowledge of their occurrence, however, does not bar employees from filing charges about related discrete acts so long as the acts are independently discriminatory and charges addressing those acts are themselves timely filed. Nor does the statute bar an employee from using the prior acts as background evidence in support of a timely claim.

*Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 113, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002). The failure to promote is a discrete discriminatory act. *Id.* at 114, 122 S.Ct. 2061.

 Plaintiff learned that she was not promoted to senior executive in March 2004. Assuming Plaintiff learned about her non-promotion to senior executive at the end of the month, on March 31, 2004, the last day for her to file a charge under Title VII was January 25, 2005. Yet, Plaintiff did not file her first Charge of Discrimination until February 23, 2005. Plaintiff claims that this non-promotion is timely under the continuing violations doctrine. However, *Morgan* "substantially limited the notion of continuing violations" and made "clear that claims based on discrete acts are only timely where such acts occurred within the limitations period." *Cherosky v. Henderson,* 330 F.3d 1243, 1246 (9th Cir.2003). Plaintiff's discrimination claim based on her non-promotion to senior executive is time barred.

**B. Osteoporosis & Vaccine Specialty Positions**

 Plaintiff's discrimination claim also fails concerning the osteoporosis and vaccine specialty positions. First, Plaintiff cannot demonstrate a prima facia case of sexual discrimination based upon the vaccine specialty position because the person selected for the position desired by Plaintiff was also a women. Even assuming a prima facia case of discrimination for the osteoporosis and vaccine specialty positions, Plaintiff has failed to offer any competent evidence that Defendants' proffered reasons for failing to promote Plaintiff— i.e., her lack of computer skills and her unwillingness to embrace company directives—were a pretext. It is undisputed that computer skills were especially important for the osteoporosis position. It is further undisputed that computer skills were a weakness for Plaintiff. Plaintiff has offered no evidence that she had similar computer skills with Blake, who was selected for the osteoporosis specialty position. To the contrary, the uncontroverted evidence shows that Blake demonstrated greater computer proficiency than Plaintiff. Further, it is uncontroverted that it was important that the person selected for the vaccine specialty position embrace the CQS sales model. Plaintiff has failed to introduce any evidence that she was willing to embrace the CQS sales model. To the contrary, the uncontroverted evidence shows that Plaintiff did not embrace CQS and that the candidates selected demonstrated their capacity to embrace CQS. Thus, Plaintiff has failed to show that Defendants discriminated against Plaintiff on account of her sex or age.

**V. Retaliation Claims**

 Plaintiff claims that Merck failed to promote her to Senior Executive Representative, Osteoporosis Specialty

Representative, and Vaccine Specialty Representative in retaliation for engaging in protected activities. To establish a prima facie case of retaliation, "a plaintiff must demonstrate: (1) a protected activity; (2) an adverse employment action; and (3) a causal link between the protected activity and the adverse employment action." *Cornwell v. Electra Cent. Credit Union,* 439 F.3d 1018, 1034–35 (9th Cir.2006). The failure of any one of these elements defeats a retaliation claim. *See Villiarimo v. Aloha Island Air, Inc.,* 281 F.3d 1054, 1065 (9th Cir.2002) (finding first two elements met but affirming summary judgment because no evidence of causal link). "To establish causation [Plaintiff] must show by a preponderance of the evidence that engaging in the protected activity was one of the reasons for [his] firing and that *but for such activity [he] would not have been fired.*" *Id.* at 1064–65 (emphasis added and internal quotations omitted). Courts have recognized "that, in some cases, causation can be inferred from timing alone where an adverse employment action follows on the heels of protected activity." *Id.* at 1065. "But timing alone will not show causation in all cases...." *Id.* (quotations omitted). "There is no set time beyond which acts cannot support an inference of retaliation, and there is no set time within which acts necessarily support an inference of retaliation." *Coszalter v. City of Salem,* 320 F.3d 968, 978 (9th Cir.2003). "Essential to a causal link is evidence that the employer was aware that the plaintiff had engaged in the protected activity." *Cohen v. Fred Meyer, Inc.,* 686 F.2d 793, 796 (9th Cir.1982).

## A. Senior Executive Position

 Plaintiff's retaliation claim for non-promotion to the senior executive position must fail. Plaintiff learned that she was not promoted to senior executive in March 2004. However, Plaintiff did not file her first Charge of Discrimination until February 23, 2005. Plaintiff has not alleged that she had engaged in any protected activity before her non-promotion to the senior executive position. Therefore, no causal link exists between the protected activity and the non-promotion.

## B. Osteoporosis & Vaccine Specialty Positions

 Although Plaintiff has met the first two elements, she cannot establish a prima facie claim of retaliation because Plaintiff has no evidence of causation. The uncontroverted evidence establishes that the decision to not promote Plaintiff to osteoporosis specialty representative was made on September 16, 2007. The massage incident was not reported until a day later, on September 17th. Further, it is uncontroverted that neither Cason nor Schwarz had any communication with Hildebrand or Vaughn regarding their decision to not promote Plaintiff. The massage incident could not have affected the decision of Cason and Schwarz because neither was aware of the incident.[13]

Similarly, Nowak, the person who made the decision to not promote Plaintiff to the vaccine specialty position, lived in Pennsylvania at the time he interviewed her on October 6, 2005. He did not move to Phoenix until March 2006. He has declared that he did not know anything about Plaintiff's complaints until after he moved

---

**13.** Plaintiff speculates that the decision was not made on September 16th because she was not notified of the decision until September 20th. However, not only does Plaintiff provide no evidence to support this speculation, but Cason has declared that she was traveling on Friday, September 17, 2004 and notified Plaintiff the first business day after she returned on September 20th. (Cason Supp. Dec. ¶ 10.)

to Phoenix in March 2006. He further declared that he had no conversations with Cason, Hildebrand, Vaughn, or Schwarz in making his decision and that they had no control or influence over his decision. Again, Plaintiff has offered no competent evidence that Nowak was aware of Plaintiff's complaints, and, therefore, has failed to establish causation.

Finally, as stated above, even assuming a prima facia case of discrimination, Plaintiff has failed to offer any competent evidence that Defendants' legitimate reasons for failing to promote Plaintiff were a pretext. Thus, Plaintiff has failed to demonstrate that she was not promoted to the osteoporosis and vaccine specialty positions in retaliation for her protected activities.

## VI. State Law Claims

Plaintiff also brings state law claims for negligence, intentional infliction of emotional distress, and constructive discharge. Defendants are entitled to summary judgment on each of these claims.

### A. Negligence

 Plaintiff alleges that Defendants breached various duties to Plaintiff by negligently training, supervising, and investigating Hildebrand and others. However, "[w]ith the exception of 'willful misconduct' on the part of the employer, these claims are barred under Arizona law by the remedy of workers compensation." *Craig,* 496 F.3d at 1060; *see also Mosakowski v. PSS World Med., Inc.,* 329 F.Supp.2d 1112, 1129–31 (D.Ariz.2003). Plaintiff has made no showing that Merck's conduct amounted to "willful misconduct." The Court will grant summary judgment on Plaintiff's negligence claim.

### B. Intentional Infliction of Emotional Distress Claim

 To establish a prima facie claim for intentional infliction of emotional distress, Plaintiff must demonstrate that: "(1) [Defendants] engaged in extreme and outrageous conduct; (2) [Defendants] either intended to cause emotional distress or reckless disregard of the near certainty that such distress will result from [Defendants'] conduct; and (3) [Plaintiff] suffered severe emotional distress as a result of [Defendants'] conduct." *Craig,* 496 F.3d at 1058 (citing *Wallace v. Casa Grande Union High Sch.,* 184 Ariz. 419, 909 P.2d 486, 495 (1995)) (internal quotations omitted). "To satisfy the first prong, the conduct must be 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community.'" *Craig,* 496 F.3d at 1058 (quoting *Cluff v. Farmers Ins. Exch.,* 560, 10 Ariz.App. 560, 460 P.2d 666, 668 (1969)). As a matter of law, Plaintiff has failed to demonstrate a prima facia case for intentional infliction of emotional distress because she has not produced evidence sufficient to meet any one of the three required elements. Summary judgment will be granted on this claim.

### C. Constructive Discharge

 Plaintiff alleges that she was constructively discharged. "[C]onstructive discharge occurs when the working conditions deteriorate, as a result of discrimination, to the point that they become sufficiently extraordinary and egregious to overcome the normal motivation of a competent, diligent, and reasonable employee to remain on the job to earn a livelihood and to serve his or her employer." *Brooks,* 229 F.3d at 930 (internal quotations omitted). "Where a plaintiff fails to demonstrate the severe or pervasive

harassment necessary to support a hostile work environment claim, it will be impossible for her to meet the higher standard of constructive discharge: conditions so intolerable that a reasonable person would leave the job." *Id.* Because Plaintiff has failed to demonstrate a hostile work environment, she is likewise unable to meet the higher standard for a claim of constructive discharge, and summary judgment will be granted on this claim.

Accordingly,

**IT IS ORDERED** Defendants' Motion to Strike (Doc. 137) is **GRANTED IN PART** and **DENIED IN PART.**

**IT IS FURTHER ORDERED** Defendants' Motion for Summary Judgment (Doc. 125) is **GRANTED.**

**IT IS FURTHER ORDERED** Defendants' Motion for Summary Judgment (Doc. 124) is **DENIED AS MOOT.**

**IT IS FURTHER ORDERED** the Clerk of the Court shall close this case.